IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF FIDENCIO C.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF FIDENCIO C., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

CONSUELO L., APPELLANT.

Filed April 15, 2025.    No. A-24-662.

Appeal from the Separate Juvenile Court of Douglas County: VERNON DANIELS, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Claudia L. McKnight for appellant.

Spencer Lueders, Deputy Douglas County Attorney, for appellee.

RIEDMANN, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

### INTRODUCTION

Consuelo L. appeals from the decision of the separate juvenile court of Douglas County, terminating her parental rights to her son, Fidencio C. We affirm.

### BACKGROUND

#### PROCEDURAL BACKGROUND

Consuelo is the mother of Fidencio, born in 2021. Our record does not reveal whether paternity was established, or if any purported father was part of the juvenile proceedings below.

- 1 -

On July 16, 2021, the State filed a petition alleging that Fidencio was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because he lacked proper parental care by reason of the fault or habits of Consuelo in that:

A. In February[] 2021, Consuelo . . . admitted to smoking methamphetamine while pregnant with said juvenile.

B. On [date], 2021, at the birth of said juvenile, Consuelo . . . refused to permit the newborn child to be tested for drugs.

C. Consuelo . . . has denied having appropriate supplies for said child.

D. Consuelo . . . indicated to [named individual], [a] hospital social worker, not knowing what to do if said juvenile began to choke or stop breathing.

E. [A named individual] has documented [Consuelo] is not providing care for said juvenile, but instead the nurses are.

F. [Consuelo] is not cooperating with hospital staff to address issues such as appropriate child care and child care preparation.

G. The minor child tested positive for benzodiazepines.

H. Consuelo . . . admitted that she has epilepsy and has seizures at home where she lives by herself.

I. Consuelo . . . has failed to provide proper parental care, support, supervision, and/or safety for said juvenile.

J. Consuelo . . . has failed to place herself in a position to parent said juvenile.

K. Consuelo['s] . . . use of drugs and/or alcohol places said juvenile at risk for harm.

L. Due to the above allegations, said juvenile is at risk for harm.

That same day, the State also filed an ex parte motion for immediate temporary custody of Fidencio to be placed with the Nebraska Department of Health and Human Services (DHHS), and the juvenile court entered an ex parte custody order that same day. Fidencio has since remained in the custody of DHHS and in foster care.

The juvenile court appointed a guardian ad litem for Consuelo on July 23, 2021.

On October 22, 2021, the State filed an amended petition alleging that Fidencio was a child within the meaning of § 43-247(3)(a) because he was homeless or destitute or without proper support "through no fault" of Consuelo in that:

A. Consuelo . . . was observed by medical professionals to have difficulty reasoning in critical situations with said juvenile.

B. Consuelo . . . was observed by medical professionals to have difficulty providing basic care to said juvenile while in the hospital.

C. Consuelo . . . denied having appropriate supplies for said juvenile.

D. Consuelo . . . indicated to [named individual], [a] hospital social worker, to not knowing what to do if said juvenile began to choke or stop breathing.

E. Said juvenile tested positive for benzodiazepines which could be attributed to a medical prescription the mother is taking for epilepsy.

F. Consuelo . . . admitted that she has epilepsy and has seizures at home where she lives by herself.

G. Consuelo . . . is unable to provide proper parental care, support, supervision, and/or safety for said juvenile at this time.

H. Consuelo . . . is unable to place herself in a position to properly parent said juvenile at this time.

I. Due to the above allegations, said juvenile is at risk for harm.

An adjudication hearing was held on October 26, 2021. In its order entered on November 4, the juvenile court found, by a preponderance of the evidence, that the allegations in the amended petition were true. Accordingly, Fidencio was adjudicated to be within the meaning of § 43-247(3)(a).

A disposition hearing was held on February 24, 2022, and the juvenile court entered its order on March 1. The court ordered Consuelo to obtain and maintain safe, stable, and adequate housing and provide proof to the case manager; obtain and maintain a legal, stable source of income and provide proof to the case manager; complete a monthly budget to assist with timely determination of ability to pay for services/treatment ordered by the court; make contact with her case manager by the 20th day of each month; submit to random UA's within 4 hours of a request by the case manager; complete an adaptive behavior assessment, which shall include assessment of competency; sign releases of information to allow DHHS to access reports from mental health professionals; have reasonable rights of supervised visitation; follow the rehabilitation plan of the court and also make reasonable efforts on her own to bring about rehabilitation; and notify the court, her attorney, and DHHS of any change in employment, address, or phone number within 48 hours of said change.

Following a review hearing in October 2022, Consuelo was also ordered to complete a psychiatric assessment to determine medication needs, complete a competence evaluation, and make application for "DD Services" with the assistance of DHHS. Additionally, the juvenile court stated that it had reviewed the adaptive behavior assessment, and the court ordered that Consuelo be provided "hands-on parenting" as she was assessed to be at "'an extremely low level of cognitive functioning on a comprehensive intelligence test.'"

Following a review hearing in October 2023, the juvenile court found that barriers to reunification included, but were not limited to, Consuelo's inability to care for the child and her overall inability to parent in the short or long term, and the length of time the child had been in care with no sustained progress. The court ordered that "beyond visitation, no continued reasonable efforts shall be required."

On October 30, 2023, the State filed a motion to terminate Consuelo's parental rights to Fidencio pursuant to Neb. Rev. Stat. § 43-292(2), (5), (6), and (7) (Reissue 2016). The State alleged that: Consuelo substantially and continuously or repeatedly neglected and refused to give Fidencio or a sibling of Fidencio necessary parental care and protection; Consuelo was unable to discharge parental responsibilities because of mental illness or mental deficiency and there were reasonable grounds to believe that such condition would continue for a prolonged indeterminate period; reasonable efforts to preserve and reunify the family, if required, failed to correct the conditions leading to the adjudication of the child under § 43-247(3)(a); the child had been in an out-of-home placement for 15 or more months of the most recent 22 months; and termination of Consuelo's parental rights was in the child's best interests. The State filed an amended motion on December

4, 2023, and a second amended motion on April 5, 2024, seeking to terminate Consuelo's parental rights to Fidencio under the same statutory grounds.

The parental rights termination hearing was held on April 29 and 30, and May 8, 2024. The State called several witnesses to testify, and numerous exhibits were received into evidence. Consuelo did not testify, and she did not call witnesses to testify on her behalf.

Theodore DeLaet, a licensed psychologist, conducted a forensic psychological evaluation and parenting risk assessment of Consuelo. Both his original report submitted in February 2022, and the addendum submitted in September 2022, were received into evidence.

According to DeLaet's February 2022 report, Consuelo reported that she was in a car accident and sustained a head injury as a child, and she developed epilepsy or seizures after the accident. She reported using methamphetamines twice in her lifetime, both uses were in February 2021, while she was pregnant. On the mental status examination, Consuelo's "quality of judgment is rated as poor" and her "level of insight is fair-to-poor." She had an IQ of 67; "[t]his score ranks in the bottom one percent nationally and is in the Extremely Low range."

The report stated that "[m]ultiple parental/family risk factors were identified for [Consuelo]."

> A primary risk factor . . . is her level of cognitive functioning. She produced a Full Scale Intelligence Quotient . . . of 67 on the comprehensive intelligence test. This is in the mild intellectual disability range. . . . This level of cognitive ability raises parenting concerns of her ability to understand, problem solve, remember, and apply information in her daily living and also in her parenting of her infant son. The same impairments would negatively impact her capacity to understand doctor's orders and care instructions for her son.

Consuelo "has troubling personality characteristics to include not always being honest, denial, and underreporting. Other indications were detected that at times she over-reports symptoms, possibly for personal gain." Her "potential to have a substance use problem [was] inconclusive." DeLaet had "concerns about [Consuelo's] level of knowledge and understanding about child development, appropriate parenting strategies, protective strategies, etc." A "social/environmental risk factor is whether [Consuelo] independently manages her own affairs and parenting her son compared to being able to function only with significant external support."

In his report, DeLaet determined that Consuelo was at moderate risk to engage in future child maltreatment. He deferred to the juvenile court to "make the 'best interest' decisions for the minor child," but recommended "proceeding with high caution about reunification efforts for [Consuelo] with her infant son." DeLaet recommended that an adaptive behavior assessment be completed for Consuelo. He recommended that Consuelo continue mental health therapy, "[a]s she reported only having attended two therapy sessions in her life, it is likely she hasn't gained much benefit from them"; "[l]ooking at appointment compliance and ability to apply treatment concepts to personal coping is relevant to the court's decision making." DeLaet also recommended "taking a competence approach to determining [Consuelo's] capacity to apply new information to personal functioning as well as independent ability to parent her son." Additionally,

[f]indings from the present assessment trigger a recommendation that removal of supports and oversights should be done on a gradual basis and not done rapidly to monitor her capacity to independently handle the transition for self-management. She is likely to experience a ceiling or maximum benefit from services and may still require assistance to providing parenting functions or to manage her own affairs.

For DeLaet's addendum submitted in September 2022, he did not meet with Consuelo again; instead, the adaptive behavior assessment was completed by her family support worker and the results were based on the family support worker's ratings of Consuelo on the standardized assessment. "From the present assessment," DeLaet confirmed a cognitive diagnosis of mild intellectual disability. Her IQ remained as previously tested. Additionally,

[t]he family support worker's rating on the adaptive behavior scale for [Consuelo] scored in the 5th percentile nationally with a standard score of 75. In consideration of other available data, [DeLaet] determines an unintentional mild elevation in [Consuelo's] adaptive functioning. Her true abilities are most likely in the mid-60s, comparable to her IQ.

DeLaet still recommended "proceeding with high caution about reunification efforts for [Consuelo] and her infant son."

At trial, DeLaet was asked if Consuelo's IQ of 67 raised any red flags in regard to her actual abilities to parent. DeLaet responded, "Yes," "generally speaking, persons with an intelligence quotient in that level have limits in the amount of things they already know," and "[t]hey will have significant problems learning new information"; "[t]hey can learn new things, but they can get overwhelmed if it's too complicated." As to his recommendation that the juvenile court should proceed with high caution regarding reunification efforts, DeLaet pointed to the "risk determination section" of his report -- "she had significant cognitive issues," "[s]he had significant medical issues in the form of her brain injury and seizures," her substance abuse problems were "inconclusive," and "[t]here was limited evidence that she would seek out help or [be] aware that she needed help with something such as her mental health therapy" (it "had to be ordered, and then she had gone a couple of times"). "So each of those things contributed to the proceed with caution because she had multiple things, any one of which could cause a significant problem in her reunification effort"; "it's sort of like juggling," "[y]ou've got to keep all of those things managed sort of at the same time."

Jake Fields, a children and family services supervisor with DHHS, testified that he has been Consuelo and Fidencio's case manager since June 2023. When Fields took over this case, he reviewed the case file, the court file, and had a "transfer staffing" with the previous case worker. When asked his understanding of when Fidencio became "court-involved," Fields stated that it was in July 2021. When asked why Fidencio became "court-involved," Fields stated that Consuelo tested positive for methamphetamines during her pregnancy and refused to allow Fidencio to be tested at birth, and there were also concerns with her answers to questions regarding parenting from the hospital staff. Fidencio has been in out-of-home care since July 2021.

Fields testified that when he took over the case there was a court order for Consuelo to sustain housing and income; participate in family support, visitation, and UA testing; and meet

with the case manager each month. Fields discussed the court orders with Consuelo at their monthly meetings. Fields saw Consuelo "[o]nce a month face to face," and "she calls me or texts me about once a week as well." Consuelo participated in monthly family team meetings up until January or February 2024, "when we stopped holding family team meetings." On cross-examination, Fields stated that he "reached out to legal parties" in March "and was told that it would most likely be inappropriate to have a family team meeting considering the filing of her termination of parental rights"; Fields confirmed that Consuelo did not refuse to participate in the team meetings, but it was on the advice or request of her counsel. Fields has not had any concerns about drug use for Consuelo since he has been on the case. An October 2023 court report received into evidence reveals that Consuelo completed multiple UAs from April through September 2023; "[f]or all tests completed except for 1 in April, Consuelo has tested positive for Benzodiazepine," and "Consuelo has shown . . . Fields a prescription for . . . a Benzodiazepine."

During Field's time on the case, Consuelo remained in the same residence. However, the housing had not remained safe for the entirety because "[w]e received reports from the visitation agency of cockroaches in the house." The cockroach issue "would pop up for a few weeks, and then [Consuelo] would take steps to eliminate the problem [a]nd then about a month or two later, it'd pop up for a couple weeks"; "that cycle just kept repeating." Consuelo had asked Fields for assistance regarding housing. "There was one instance where she asked me to call her landlord to have her spray her apartment again for bugs," "[s]he told me the landlord was spraying every two weeks." "And then there was another incident where she asked me to cosign on an apartment for her"; Fields found that "[a] little bit" concerning because "[i]t seemed there was no, like, clear boundary between our relationship as case manager and client." According to Fields, Consuelo had a legal source of income as she received "SSI benefits" "for a diagnosis of mild intellectual disability."

Fields was asked what efforts DHHS made regarding the juvenile court's October 2022 order for Consuelo to be provided hands-on parenting. He stated that Consuelo was provided supervised visitation for 20 hours each week and there were "instructions for the visitation worker to try their best to supervise [Consuelo] parent [Fidencio] on her own as best as possible." DHHS received visitation reports from the visitation agency, and Fields had "never seen documentation from the visitation agency stating that . . . [Consuelo] has fulfilled the court order"; he confirmed his belief that she still needed hands-on parenting.

Caitlin Means, is a family advocate at Apex Family Care. She said, "I help parents, biological family members with parenting skills and support them in any way I can." In September 2022, Means was asked to assist Consuelo with her parenting skills. Consuelo had been a "client" ever since. Means provided supervised visitation and provided redirection and assistance to Consuelo as needed.

Since September 2022, Consuelo has had supervised visits in her home Monday through Friday, for 4 hours each day, and she regularly participated in the visits. Means believed that Consuelo had established a bond with Fidencio and provided for all of his basic needs. When asked if she had any concerns about Consuelo during visits, Means replied, "No."

Means "often" had to redirect Consuelo during visits regarding when, how, and what to feed Fidencio. Means said in the beginning "it was pretty common for [Consuelo] to feed Fidencio, like, cookies, candy, doughnuts," but "[r]ecently she's gotten better about fixing a meal" although

"[s]he can still struggle with letting him snack, and it'll come down to him not wanting to eat come mealtime because she'll let him snack all morning." When Means discusses the issue with Consuelo, Consuelo "can sometimes feel offended because . . . she'll take it as me not letting her be the parent and . . . letting her feed Fidencio on her own or what she wants to feed him when she wants to feed him." Additionally, Means "often" had to redirect Consuelo regarding nap time and screen time. Means worked with Consuelo on parenting skills, such as Fidencio's education, development, and health. Regarding education, Means said that Fidencio "learns more one on one than he would with a screen." Regarding development, "playing with [Fidencio] and talking with him would enhance his vocabulary rather than being glued to a screen." And regarding health, "the more health[y] stuff that he eats, the more likely he is to want to eat a meal and the more he is wanting to eat the better foods."

In addition to the above, Means "often" had to redirect Consuelo regarding discipline. Means was asked to give an example of a time within the last month that she had to redirect Consuelo regarding discipline. Means replied, "His hitting or him telling her 'no' repeatedly. I would use that as an example of, . . . he can't -- like, screaming and just melting down for no reason and her essentially babying him and trying to . . . comfort him nicely, and him being mean with his behavior was not acceptable." Means said, "I'd be like, 'This would be a good opportunity for a timeout, just to give him a minute to . . . gather himself, to calm down before you start talking with him.'" However, Consuelo's response would be that he was just a baby and just trying to express his emotions.

Parenting time progress notes were received into evidence and notes from January 2024 state that "Consuelo can struggle with being a parent and making most parenting decisions herself without relying on PTS very often. . . . PTS is working with Consuelo daily on building her confidence in parenting decisions." "Consuelo does not discipline. PTS is always working with Consuelo on how to redirect negative behavior, as well as disciplining."

Means was asked if she believed the reasons for the referral to Apex had been alleviated regarding Consuelo. Means replied, "Yes," "[b]ecause she has a very strong bond with Fidencio," "[s]he loves him" and "[h]e loves her," "their relationship is strong" and "[h]e doesn't go without during visits." When asked if there was ever a visit between Consuelo and Fidencio where she did not have to redirect Consuelo regarding parenting skills, Means replied, "Yes, but it's rare." When asked if she would feel comfortable if Consuelo was allowed to have unsupervised visits, Means replied, "I don't have any safety concerns that I wouldn't trust her with Fidencio by herself." The following colloquy was had on the record between the State and Means.

Q [by the State]. If Consuelo was allowed to have unsupervised visits with Fidencio, would you feel confident that she would provide him with the necessary food that [he] needs?

A [by Means]. It's hard to say.

Q. Would you feel confident that she would be able to provide discipline that Fidencio needs?

A. No.

Q. Why not?

A. Because based off of my time with her, she lacks on that. And she feels that her time with him should be more fun than it is -- than to discipline.

Q. Do you feel that based on the amount of redirection that you've had to provide Consuelo that she's understanding the redirection that you're providing?

A. To an extent.

Q. Can you expand on that?

A. She understands, but I feel like she focuses more on what is going to go into my documentation that she realized [sic] more on me than putting confidence into herself than [sic] making the choices on her own.

When asked if she felt that Consuelo relied on her being present during visits, Means responded affirmatively.

Case manager Fields noted that even though the juvenile court ordered in October 2023 that no more reasonable efforts were required, DHHS still provided her supervised visitation. Fields last spoke to Consuelo about visitation at the end of March or in April 2024. He said Consuelo wanted more time with Fidencio and "[s]he believed that her visitation worker was . . . exaggerating her documentation, that her visitation worker was just documenting any little tiny thing that she could, and that she believed that visitation was going well regardless." Consuelo's responses concerned Fields because "[she] had been with the visitation worker for a considerable amount of time, close to a year, maybe more," and Fields "never heard these concerns up until recently." Fields stated that "[m]ost cases progress to unsupervised visitation by this point," and "we haven't even thought about making that recommendation."

Fidencio's foster mother testified that Fidencio has been placed with her since he was 2 days old; he was 33 months old at the time the termination hearing commenced. Fidencio previously had visits with Consuelo 5 days each week for 3 hours each day. Since the end of March 2024, visits have been 2 days each week. The foster mother said that Consuelo had been consistent with her visits "for the most part." The foster mother's concerns were that Fidencio was not having "[s]ufficient naps" or was having no naps during visits, and that led him to have "emotional dysregulation, meltdowns and tantrums that seem more over the top for a two-year-old." The nap schedule and behavior issues had improved since visits were decreased from 5 days a week to 2 days a week. Consuelo has contacted the foster mother about Fidencio's well-being. The foster mother also let Consuelo know when Fidencio's pediatric wellness checkups and dental appointments were scheduled, and Consuelo attended those checkups and appointments. The foster mother stated that Consuelo's behavior at Fidencio's wellness appointments "varies," and "[t]here's been a few times where it's gotten a little heated with the pediatrician, . . . but [the pediatrician] does a good job of deescalating some of those emotions and just explaining that we're all on the same team and for the benefit of Fidencio"; "[t]here's times when we were given information on . . . proper care for him but sometimes some of those tips were ignored."

Case manager Fields described Consuelo's overall progress towards reunification as "minimal," "[s]he tries very hard, but nothing is seeming to work." "The concerns that led to [Fidencio's] removal are still present, and with it being almost three years later . . . as far as I read from our case file, DHHS has tried everything that we can think of and nothing has worked to remove those concerns." Accordingly, Fields opined that it would be in Fidencio's best interests to terminate Consuelo's parental rights.

In an order filed on August 13, 2024, the juvenile court terminated Consuelo's parental rights to Fidencio after finding that statutory grounds for termination existed pursuant to § 43-292(2), (6), and (7), and that termination of parental rights was in Fidencio's best interests. The court dismissed the allegation regarding § 43-292(5) for failure of proof.

Consuelo appeals.

## ASSIGNMENTS OF ERROR

Consuelo assigns, restated, that the juvenile court erred in (1) finding that statutory grounds exist to terminate her parental rights under § 43-292(2), (6), and (7), and (2) finding that termination of her parental rights was in Fidencio's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## ANALYSIS

### STATUTORY GROUNDS FOR TERMINATION

The State sought to terminate Consuelo's parental rights to Fidencio under § 43-292(2), (5), (6), and (7). The juvenile court found, by clear and convincing evidence, that grounds for termination existed under § 43-292(2), (6), and (7); it found that there was a failure of proof for § 43-292(5).

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." The existence of the statutory basis alleged under § 43-292(7) should be determined as of the date the petition or motion to terminate is filed. *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). By the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. *In re Interest of Mateo L. et al., supra*. Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra*. In other words, if the 15-out-of-22 months' period is met, § 43-292(7) is met. See *In re Interest of Mateo L. et al., supra*.

Fidencio was removed from Consuelo's custody in July 2021, and he remained in foster care thereafter. By the time the motion to terminate Consuelo's parental rights was filed on October 30, 2023, he had been in an out-of-home placement for 27 months. And by the time the second amended motion to terminate Consuelo's parental rights was filed on April 5, 2024, he had been in an out-of-home placement for more than 32 months. The 15-out-of-22 months' period was clearly satisfied.

The State has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for terminating Consuelo's parental rights to Fidencio. And since any one of the bases for

termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning any other statutory basis for termination. *In re Interest of Mateo L. et al., supra*. We next consider whether termination is in Fidencio's best interests.

BEST INTERESTS AND UNFITNESS

Under § 43-292, in addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

There is no doubt that Consuelo loves Fidencio, is bonded to him, and seems to be trying hard to reunify with him. However, case manager Fields described Consuelo's overall progress towards reunification as "minimal," stating that "[s]he tries very hard, but nothing is seeming to work." The record reveals that despite having "hands-on" parenting assistance since September 2022, Consuelo still "often" needed redirection and reminders regarding basic parenting skills; when Means was asked if she would feel confident that Consuelo would provide Fidencio with the necessary food if allowed to have unsupervised visits, Means' answer was "It's hard to say." And Means felt that Consuelo relied on her being present during visits. According to Fields, "The concerns that led to [Fidencio's] removal are still present, and with it being almost three years later . . . as far as I read from our case file, DHHS has tried everything that we can think of and nothing has worked to remove those concerns."

Fields opined that it would be in Fidencio's best interests to terminate Consuelo's parental rights. At the time the termination hearing concluded, Fidencio had been in an out-of-home placement for more than 33 months, and Consuelo had not progressed beyond supervised visitation. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). And when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Leyton C. & Landyn C., supra*. The State proved that Consuelo was unfit, meaning that she has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the child's well-being. See *id.* We further find that there is clear and convincing evidence that it is in Fidencio's best interests to terminate Consuelo's parental rights.

## CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Consuelo's parental rights to Fidencio.

AFFIRMED.