IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

IN RE INTEREST OF TABITHA B.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF TABITHA B., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,
V.
SARAH B., APPELLANT.

Filed January 28, 2014.    No. A-13-445.

Appeal from the Separate Juvenile Court of Sarpy County: LAWRENCE D. GENDLER, Judge. Affirmed.

Eric M. Rees, of Blinn & Rees, P.C., L.L.O., for appellant.

Sandra K. Markley, Deputy Sarpy County Attorney, and Ken Smith, Senior Certified Law Student, for appellee.

IRWIN, MOORE, and BISHOP, Judges.

BISHOP, Judge.

Sarah B. appeals from the decision of the separate juvenile court of Sarpy County terminating her parental rights to her daughter, Tabitha B. We affirm.

BACKGROUND

Sarah is the biological mother of Tabitha, born in February 2011. Tabitha's biological father is unknown. Because Tabitha's father is not part of this appeal, he will not be discussed further.

The State's involvement with this family began at the time of Tabitha's birth in February 2011, when the Nebraska Department of Health and Human Services (DHHS) received a report regarding Sarah's history of drug use and mental health issues. Tensions were also high between Sarah, her boyfriend (whom she later married in May), and her parents at the hospital following

- 1 -

Tabitha's birth, and hospital security had to be called to intervene. DHHS worked with Sarah on a voluntary basis, and the case was closed unsuccessfully in the summer of 2011.

In August 2011, the Bellevue Police Department (BPD) responded to a call that Sarah was being treated at a hospital after she was allegedly choked by her husband during a domestic assault occurring at their residence while Tabitha was present. Sarah's drug test at the hospital indicated that she "tested positive for THC and methamphetamine."

On September 6, 2011, Sarah's mother, Kelly N., received a call from Sarah saying that someone she did not know had taken Tabitha. When Kelly arrived at Sarah's residence, she observed brown powder and "'pipes for smoking drugs'" on the kitchen table. Sarah told her several stories, including that Tabitha had been kidnapped. Kelly later found Tabitha at Sarah's boyfriend's mother's house, and Kelly then took Tabitha home with her. Kelly refused to let Sarah take Tabitha back, despite several attempts by Sarah. On September 7, BPD responded to a call at Kelly's residence when Sarah tried to get Tabitha. BPD stopped Sarah in her vehicle, and officers subsequently found a pipe with marijuana residue in the vehicle. On September 8, BPD placed Tabitha with DHHS for protective custody. Tabitha has remained in DHHS' custody, with placement in Kelly's home, ever since.

In November 2011, the State filed an amended petition alleging that Tabitha was a child as defined by Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) due to the faults or habits of Sarah. In an order filed on November 16, Tabitha was adjudicated due to the faults or habits of Sarah.

Several review and permanency hearings were held in 2012 and 2013, the proceedings of which do not all appear in our record. Sarah was ordered to complete a neurological evaluation, complete a psychological evaluation, complete a psychiatric evaluation, complete a neuropsychological evaluation, participate in dual diagnosis treatment, participate in individual counseling, participate in a chemical dependency evaluation, participate in chemical dependency treatment, abstain from alcohol and all controlled substances not prescribed by a licensed physician, not associate with persons who use alcohol and drugs, submit to random drug testing, maintain a suitable residence, seek and maintain gainful employment, and have reasonable supervised visitation.

On March 5, 2012, the State filed a motion to terminate Sarah's parental rights to Tabitha pursuant to Neb. Rev. Stat. § 43-292(5) (Cum. Supp. 2012). At a review hearing on October 29, the State orally withdrew the pending motion to terminate, stating that it would refile the motion to terminate at a later date.

On December 10, 2012, the State filed a new motion to terminate Sarah's parental rights to Tabitha pursuant to § 43-292(6) and (7). The State alleged that reasonable efforts had failed to correct the conditions leading to the adjudication, that the child had been in an out-of-home placement for 15 or more of the most recent 22 months, and that termination was in the child's best interests.

The termination hearing was held on March 15, 2013, and continued to April 11. Evidence was presented regarding Sarah's progress throughout this case.

Betsy Mayfield is a licensed independent mental health professional and a licensed chemical dependency counselor. She conducted an "Adult Integrated Addiction and Mental Health Evaluation" of Sarah on October 31, 2011. Mayfield's evaluation report was received into evidence in lieu of her testimony. Mayfield noted that Sarah's behaviors throughout the

evaluation were inconsistent. She would appear angry and then quickly change to being more pleasant. Sarah's reporting of events to various people also contained multiple inconsistencies. For example, Sarah had told other providers that she was in a car accident in 2010, which resulted in her being in a coma; when she awoke, she spoke with a Russian accent which was diagnosed as a foreign accent syndrome. Sarah told Mayfield that the car accident resulted in only a mild concussion, with no ongoing negative effects. Sarah stated that she learned the Russian language on her own and did not identify having an accent. However, throughout the evaluation, Sarah spoke with a foreign language accent, which at times made it difficult to understand her. There were also varied reports of Sarah's history of drug use. Mayfield recommended that Sarah seek "co-occurring residential treatment, with further assessment of her mental health and substance use."

Colleen Conoley is a licensed psychologist and neuropsychologist. She conducted a neuropsychological evaluation of Sarah during two sessions in December 2011. Conoley's evaluation report was received into evidence in lieu of her testimony. Conoley noted:

> Throughout both sessions [Sarah] was emotionally dysregulated, with several histrionic episodes. It was difficult to remember that she is an adult. When retelling events she was extremely disorganized and confabulation was apparent. Interestingly, no articulation errors noted, despite a previous report of foreign accent syndrome. Throughout the second session she accused me several times of lying to her about nonsensical events. When told that she performed poorly on a measure, she would argue against the finding or state that I had lied.

Conoley stated that Sarah has acquired a self-inflicted brain injury from methamphetamine toxicity and that any therapeutic changes will be lengthy. According to Conoley, Sarah is "several years away from being capable of making appropriate decisions or demonstrating intact emotional regulation" and is "not in a mindset that could offer appropriate safety for her daughter." Conoley also stated that there is a "very good chance that [Sarah] will never reach the point where she can be considered safe to care for Tabitha" and termination of parental rights should not be dragged out.

Dana Moyer is a child and family services specialist with DHHS. She was the initial assessment worker assigned to the intake in August 2011. Moyer testified that DHHS had two prior intakes related to Tabitha. In February and April, there were intakes regarding Sarah's drug use and ability to care for Tabitha. Sarah was provided voluntary services in those prior instances.

Moyer testified that in August 2011, she was assigned to investigate concerns of domestic violence in the home, Sarah's drug use, and criminal activity in the home. Sarah was taken to the hospital regarding an incident of domestic violence with her husband. While at the hospital, Sarah tested positive for methamphetamine. Sarah reported that her husband must have put the methamphetamine in her water. Moyer testified that after Tabitha's removal, her hair follicle test revealed that she had been exposed to methamphetamine.

Sallie Bundy is a family support worker and parenting time specialist. She has been providing services to Sarah since October 2012. Sarah is allowed two visits per week, each visit lasting 4 hours. According to Bundy, Sarah's attendance at visits has been sporadic. In 2012,

Sarah attended three of eight visits in October, seven of eight visits in November, and three of eight visits in December. In 2013, Sarah attended five of nine visits in January, six of eight visits in February, and five of nine visits in March.

Bundy testified that she has never been able to recommend less than supervised visits because of safety concerns. Sarah is "very, very good" with Tabitha when they are one-on-one; Sarah plays with her, can give her a bath, and is able to change a diaper. However, "when outside influences come in that distract [Sarah], she cannot be aware of what [Tabitha's] possibly doing or her -- her physical needs." For instance, during a visit in November 2012, Sarah was upset and crying because she received a call saying that she was supposed to be at work, and Sarah did not notice that Tabitha (20 months) was on top of the kitchen table. In February 2013, Bundy, Sarah, and Tabitha were at a store when Sarah asked Bundy to finish Sarah's transaction for her and Sarah walked away leaving Tabitha with Bundy.

Bundy also testified regarding an incident in March 2013, when Sarah exhibited erratic behavior and was inappropriate with Bundy. Bundy was driving Sarah home after a visit. Sarah was mad at Bundy because during the visit, Sarah had dropped her telephone and Bundy did not take the telephone away from Tabitha and give it back to Sarah. Bundy told Sarah that she should have gotten the telephone from Tabitha herself. Bundy also expressed her frustration to Sarah because Sarah had told her earlier that she was not feeling very well, but that she was good enough to have a visit; then during the visit, Sarah made herself throw up and ended the visit early, saying that she was sick and needed to go home and cancel her work shift. Sarah proceeded to yell profanities at Bundy, saying that she "'knows her body'" and is "'in tune with her body'" and that she was not sick. Bundy stopped communicating with Sarah about the visit because she did not want Sarah to become more verbally aggressive. Sarah continued to yell profanities at Bundy. Sarah started crying, called her parents, and told her father that she was very sick and that someone had poisoned her the night before. Bundy testified that she was fearful of Sarah during this incident in March.

Jennifer Cornett, a family and permanency specialist, was assigned as a voluntary worker on this case prior to September 2011, but since September has worked with this family on a formal basis. Cornett testified about Sarah's progress since Tabitha's removal. In November 2011, Sarah was arrested for assaulting a police officer. She also had an arrest for possession of methamphetamine and paraphernalia. Between November 2011 and July 2012, Sarah spent time in both the Sarpy County jail and the Lincoln Regional Center (for a competency evaluation). Sarah was released from jail on July 3, 2012. Upon Sarah's release, Cornett tried to assist Sarah in completing her court-ordered services. However, between her release in July and the hearing on October 29, Sarah completed only one urinalysis test (four tests per month were offered), did not participate in individual counseling or chemical dependency treatment, was employed sporadically, did not maintain stable housing (had nine different residences during that timeframe), and had only 2 to 3 hours of visitation per week, even though authorized to have 9 hours of visitation per week. Cornett stated that two family support workers released Sarah for failure to utilize services.

Cornett testified that at the court hearing on October 29, 2012, the court ordered Sarah to complete updated evaluations. In December, Sarah left for Texas for several weeks and DHHS

was not sure whether she was coming back; this was after Sarah said she would try to regain custody of Tabitha.

Cornett testified that up until January 2013, Sarah had not been cooperative with workers or services and had not been consistent in maintaining contact with workers. Sarah's contact with workers had gotten better since mid-January. Sarah started participating in urinalysis testing in January, and all tests have been negative. Sarah also completed a new chemical dependency evaluation on January 9, but she would not release a copy to DHHS. And Sarah apparently started intensive outpatient treatment on March 13, 2 days prior to the start of the termination hearing. Sarah completed the first half of her new psychological evaluation on March 14, 1 day prior to the start of the termination hearing, but still had not completed the evaluation when the termination hearing resumed on April 11. Cornett stated that Sarah still does not have a stable residence (she has had four different residences since October 2012).

Cornett testified that Sarah had not made sufficient progress to have less than supervised visits. In Cornett's opinion, Sarah is an unfit parent because her "behaviors and erratic-ness throughout this case have proven that she's not able to care for her daughter." Cornett testified that terminating Sarah's parental rights is in Tabitha's best interests. Cornett stated that Tabitha is in a stable, safe, and loving environment and that she has bonded with her grandparents.

Elizabeth Bennett-Florez testified on Sarah's behalf. Bennett-Florez testified that she met Sarah at a musical event attended by those in recovery. At the event, they discovered they were third cousins. Shortly thereafter, Sarah moved in with Bennett-Florez and Bennett-Florez' boyfriend and 12-year-old son. Bennett-Florez feels safe having Sarah living in her home and has left her son with Sarah numerous times.

In its order filed on April 16, 2013, the juvenile court terminated Sarah's parental rights to Tabitha pursuant to § 43-292(6) and (7) and found that termination was in Tabitha's best interests. Sarah has timely appealed the juvenile court's termination of her parental rights.

ASSIGNMENT OF ERROR

Sarah assigns that the juvenile court erred in finding that terminating her parental rights was in Tabitha's best interests.

STANDARD OF REVIEW

Cases arising under the Nebraska Juvenile Code are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the trial court's findings. *In re Interest of Rylee S.*, 285 Neb. 774, 829 N.W.2d 445 (2013). However, when the evidence is in conflict, the appellate court will consider and give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

ANALYSIS

*Grounds for Termination.*

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

In its order terminating Sarah's parental rights to Tabitha, the juvenile court found that reasonable efforts failed to correct the condition which led to the adjudication (§ 43-292(6)) and that Tabitha had been in an out-of-home placement for 15 or more months of the most recent 22 months (§ 43-292(7)).

Sarah does not contest the juvenile court's finding that grounds for terminating her parental rights exist. And having reviewed the record, we find that grounds did exist. Section 43-292(7) provides for termination of parental rights when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." Tabitha was removed from parental care on September 8, 2011. At the time the motion to terminate parental rights was filed on December 10, 2012, Tabitha had been in an out-of-home placement for 15 months. And at the time the termination hearing began in March 2013, Tabitha had been in an out-of-home placement for 18 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Sarah's parental rights under § 43-292(7) were proved by sufficient evidence. Once a statutory basis for termination has been proved, the next inquiry is whether termination is in the child's best interests.

*Best Interests.*

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *Id.*

Sarah has failed to consistently cooperate with workers or participate in services. Only recently did Sarah begin to participate in some services. Sarah started cooperating with urinalysis testing in January 2013. She completed a new chemical dependency evaluation on January 9, but she would not release a copy to DHHS. Sarah did not start intensive outpatient treatment until March 13, 2 days prior to the start of the termination hearing. She did not begin a new psychological evaluation until March 14, 1 day prior to the start of the termination hearing, and still had not completed the evaluation when the termination hearing resumed on April 11. At the time of the termination hearing, she still did not have a stable residence.

In *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 911-12, 782 N.W.2d 320, 329-30 (2010), the Nebraska Supreme Court said:

> While we agree with the juvenile court that the record shows that [the mother] has made recent progress in achieving the goals set forth in the rehabilitation plans, these efforts have largely come after the State filed the petition to terminate her parental rights. Even taking these efforts into account, [the mother] has been unable to keep a job, abstain from alcohol, or successfully parent her children unsupervised. We must agree with the testimony of the service providers involved with this family that indefinite foster care is not advisable for these children. Based on the record, the State established by clear and convincing evidence that it is in the best interests of the four minor children that [the mother's] parental rights be terminated.

The same is true in this case. Sarah's recent efforts have been too little and come too late.

- 6 -

Sarah had never moved beyond supervised visitation. Moreover, she was not attending all of her authorized visits. In the first 3 months of 2013, Sarah attended only 16 of 26 visits. During visits, Sarah was unable to focus on Tabitha when outside stressors came into play. Even in March 2013 (the month that the termination hearing began), Sarah exhibited erratic and nonsensical behaviors. She repeatedly changed her statements about being sick, she yelled profanities at the family support worker, and she accused someone of poisoning her.

Cornett stated that Tabitha is in a stable, safe, and loving environment and that she has bonded with her grandparents. Cornett testified that terminating Sarah's parental rights is in Tabitha's best interests. While Cornett's statements regarding the stability of Tabitha's foster placement is not appropriate criteria for termination of Sarah's parental rights, see *In re Interest of Destiny A. et al.*, 274 Neb. 713, 742 N.W.2d 758 (2007), the juvenile court did not rely on such statements and neither does this court. Cornett also testified that Sarah is an unfit parent because her "behaviors and erratic-ness throughout this case have proven that she's not able to care for her daughter." We agree.

According to Conoley, Sarah is "several years away from being capable of making appropriate decisions or demonstrating intact emotional regulation" and is "not in a mindset that could offer appropriate safety for her daughter." Conoley also stated that there is a "very good chance that [Sarah] will never reach the point where she can be considered safe to care for Tabitha" and that termination of parental rights should not be dragged out. Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012).

At the time the termination hearing began in March 2013, Tabitha had already been in an out-of-home placement for 18 months. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). Sarah is an unfit parent. Therefore, after our de novo review, we find that it is in Tabitha's best interests that Sarah's parental rights be terminated.

CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Sarah's parental rights to Tabitha.

AFFIRMED.