IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF AZIAH J.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF AZIAH J., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

TROY J., APPELLANT.

Filed June 17, 2025.    No. A-24-822.

Appeal from the Separate Juvenile Court of Douglas County: MATTHEW R. KAHLER, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Emma J. Lindemeier for appellant.

Shinelle Pattavina, Deputy Douglas County Attorney, for appellee.

PIRTLE, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Troy J. appeals from an order of the Separate Juvenile Court of Douglas County terminating his parental rights to his child, Aziah J. We affirm.

## II. BACKGROUND

### 1. PROCEDURAL BACKGROUND

Troy is the legal father of Aziah, born in July 2020, and Laceiara J. is her biological mother. Because Laceiara is not involved in this appeal, she will only be discussed as necessary. Laceiara has four minor children mentioned in various parts of the record before us; sibling genetic testing

- 1 -

indicated that Laceiara's four minor children were all "full siblings." The other three children are not at issue in this appeal.

On August 18, 2020, the State filed a petition alleging that Aziah was within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2024), because she lacked proper parental care by reason of the fault or habits of Troy in that:

> A. Troy . . . engages in domestic violence in front of said juvenile.
> B. Troy . . . is currently incarcerated.
> C. Troy . . . has subjected said juvenile to physical abuse, resulting in said juvenile being hospitalized.
> D. Troy . . . has failed to provide for the care, support, supervision[,] and/or safety of said juvenile.
> E. Troy . . . has failed to provide said juvenile with safe, stable housing.
> F. For the above reasons, said juvenile is at risk for harm.

Also on August 18, the State filed an ex parte motion for immediate custody and pickup. The juvenile court entered an ex parte order that same day, granting temporary custody of Aziah to the Nebraska Department of Health and Human Services (DHHS) for appropriate placement.

On September 30, 2020, Aziah was adjudicated to be within the meaning of § 43-247(3)(a) based on Troy's plea of no contest to the allegations in A, B, and F of the petition. The allegations in C, D, and E were dismissed pursuant to the plea. Troy was ordered to enroll in and successfully complete a parenting course; participate fully in and successfully complete domestic violence programming; participate in agency-supervised visitation with Aziah; upon release from incarceration, obtain and maintain a legal source of income and safe and adequate housing to provide for himself and Aziah, and undergo random, frequent, observed drug testing; have no contact or communication with Aziah's mother; and undergo a co-occurring evaluation.

Over the next few years, Troy was also ordered to participate in family support services, undergo a chemical dependency evaluation, not possess or ingest alcohol and/or controlled substances unless prescribed by a physician, undergo a psychological evaluation with a parenting assessment, complete a batterer's intervention program, cooperate fully with a family support worker, maintain contact with all case professionals, allow unannounced drop-ins at his house by case professionals, participate in therapy as recommended by the psychological evaluation and parenting assessment, participate in parenting instruction with a family support worker, sign releases as requested, complete dual diagnosis outpatient therapy, and complete genetic testing.

Aziah remained in foster care until August 2023. On August 16, the juvenile court found that it was in Aziah's best interests to be placed with her mother so that Aziah and her siblings could attend an early childhood development program or daycare near her mother's home. However, on February 7, 2024, Aziah was removed from her mother's care and placed back into the temporary custody of DHHS. It was alleged that despite their history of domestic violence, Laceiara continued to have contact with Troy and had recently given birth to another child. Laceiara frustrated efforts by DHHS to complete genetic testing, but when it was accomplished, the testing showed that Laceiara's four children were "full siblings," meaning Troy was the father of all of them. Laceiara nevertheless claimed she had no contact with Troy. Due to Laceiara's

dishonesty and for other reasons, it was determined that Laceiara's children were at risk for harm if they remained in her care. Aziah has remained in foster care ever since.

On June 6, 2024, the State filed a motion to terminate Troy's parental rights to Aziah pursuant to Neb. Rev. Stat. § 43-292(1), (2), (6), (7), and (9) (Reissue 2016). The State alleged that Aziah had been abandoned by Troy for 6 months or more immediately prior to the filing of the petition; that Troy substantially and continuously or repeatedly neglected and refused to give Aziah or a sibling necessary parental care and protection; that reasonable efforts to preserve and reunify the family had failed to correct the condition leading to the determination; that the children had been in an out-of-home placement for 15 or more months of the most recent 22 months; and that Troy had subjected Aziah or another minor child to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse. The State further alleged that termination of Troy's parental rights was in Aziah's best interests.

## 2. TERMINATION HEARING

A hearing on the motion to terminate Troy's parental rights took place on September 23, 2024. Two witnesses testified for the State, and exhibits were received into evidence consisting of court reports and lengthy transcripts from past proceedings. Troy elected not to testify nor offer any additional evidence.

### (a) Foster Mother

Rashawn S. testified that she was Aziah's foster mother from October 2021 until Aziah was placed with Laceiara in August 2023. When Aziah was placed back into the temporary custody of DHHS in February 2024, Rashawn resumed caring for Aziah and continued in that role through the termination hearing.

Rashawn discussed Aziah's speech development while in her care. Aziah was placed in speech therapy during her initial placement with Rashawn due to speech delays. When Aziah returned to Rashawn's care in February 2024, Rashawn noticed that Aziah's speech development had regressed to "babbling a lot." Rashawn re-enrolled Aziah in speech therapy and took Aziah to all of her speech and doctors' appointments.

According to Rashawn, Troy did not attend any of Aziah's appointments. Nor did Troy reach out to or send Aziah any cards, gifts, or letters. Additionally, Rashawn had never seen Troy interact with Aziah and was unaware of a visitation schedule between them. Throughout the time Aziah had resided with Rashawn, Aziah had never spoken to Rashawn about Troy. During cross-examination, Rashawn acknowledged that she did not provide Troy with her phone number or address, nor did she invite him to appointments, request financial assistance from him, or provide him with updates regarding Aziah.

### (b) DHHS Case Specialist

Samantha Hutchison, a DHHS child and family services specialist, testified that she was assigned to Aziah's case in September 2022 and was the acting case manager at the time of the termination hearing. When she took over Aziah's case, Hutchison completed a "transfer staffing" with the previous case manager and reviewed all the case files. She learned that Aziah was removed from Troy's care following a domestic violence incident between Troy and Laceiara,

which resulted in harm to Aziah. According to Hutchison, Troy threw Aziah into a ceiling fan, and she had to be taken to the hospital to be evaluated for potential brain injuries.

Hutchison stated that, to her knowledge, there had been about four or five other domestic violence incidents between Troy and Laceiara since Aziah's removal. There were two separate instances where Laceiara reported that Troy had set her vehicles on fire. She also reported an incident in which Troy had sexually assaulted her, as well as another in which he strangled her while she was pregnant. Hutchison stated that she had not received any reports of domestic violence since taking over Troy's case in September 2022.

Hutchison also discussed her attempts to contact Troy since being assigned to the case. She made weekly efforts to contact him by calling the phone number on file for him and his mother, leaving voicemails, and sending text messages. However, she had little success and was only able to speak with him five or six times throughout her time as case manager. Hutchison testified that the previous case manager also had "close to no contact with [Troy]."

Hutchison's first successful contact with Troy occurred in December 2022, when she called and introduced herself as Aziah's case manager. However, the call was disconnected, and she was unable to reconnect with him. The next successful communication took place in January 2024, during which Hutchison and Troy spoke on the phone and scheduled a time to meet. Troy did not show up to the meeting, and Hutchison could not reach him for the rest of January. The next time Hutchison had successful communication with Troy was in February during another phone call. They scheduled a meeting for that day, but Troy once again failed to show up. Later that month, Troy called the DHHS hotline and asked to speak with someone regarding Aziah. The hotline notified Hutchison, and she immediately returned his call. However, she was unable to get in contact with him.

Hutchison's next contact with Troy occurred in June 2024 while he was incarcerated at Douglas County Corrections on charges related to what she described as "some violent outbursts that he had." During their conversation, Hutchison asked Troy about Aziah, Aziah's siblings, and his recent whereabouts. Troy responded that he had "been around" and asked if Hutchison could help him get released from jail. She responded that she could not provide that type of help and redirected the conversation to the issue of paternity regarding Aziah's siblings. Hutchison informed Troy that genetic testing had been completed for Aziah and her siblings, and the results indicated that they were full siblings. In response, Troy stated that it was not his responsibility to complete a paternity questionnaire and that it "would be on the mother to do that." Finally, when asked whether he had seen Aziah or her mother at any point, including the period when Aziah was placed in her mother's home, Troy said that he had not.

The last time Hutchison was able to get in contact with Troy prior to the morning of the termination hearing was in July 2024. Hutchison explained that Troy called her and asked for help in obtaining a new ID and social security card. Hutchison picked him up and drove him to the social security office. During the drive, they talked about Troy's involvement with Aziah. Troy explained that if Aziah saw him on the street, she would "run up to him and know who he is." Hutchison then asked Troy about his current living and working situation, to which he replied that he was homeless.

Hutchison stated that she developed concerns about Troy during their drive to the social security office. She suspected that he was intoxicated due to the smell of alcohol on him. She also stated:

> [A]s I was communicating with him and using . . . Google Maps on my phone to get us to the Social Security Administration, he appeared to become agitated with me. He asked me if I was recording him. He asked me why I was acting like the police. I felt as though his demeanor completely flipped from pretty seemingly easygoing to very serious and concerned about what I was doing and who I was. And then I was also concerned that he did not know who I was or remember or grasp who I was.

When Hutchison dropped Troy off, he referred to her as "Nelly," so she reintroduced herself as "Sam," the "caseworker for the children."

Hutchison also testified about Troy's various court orders. He was ordered to participate in supervised visitation with Aziah; however, he did not attend a single visit throughout the duration of the case. During a conversation with Troy in either June or July 2024, he expressed interest in visiting Aziah, but no visits took place. Hutchison explained that Troy's lack of communication was one of the main reasons why visits did not occur, as it prevented her from referring him to the appropriate services.

Troy was also ordered to maintain safe and adequate housing. As previously mentioned, Troy reported being homeless in July 2024. Hutchison testified that she was never able to confirm where Troy was residing prior to July, and she was never able to complete a walkthrough of his living situation.

Troy was ordered to obtain and maintain a legal source of income, but Hutchison "[did not] really know" where Troy had been working. When she spoke to him while he was incarcerated in June 2024, he indicated that he had a job but gave no further details. She further stated that at some point, he applied for DHHS benefits and reported that he was working at a catering company. However, she was never able to confirm employment for him.

Troy was ordered to have no contact or communication with Aziah's mother, Laceiara. Troy claimed that he had not been in contact with Laceiara since the beginning of the case; however, Hutchison did not believe this to be true. She suspected that Troy and Laceiara had, at the very least, communicated with each other and that they may have been in a relationship. Hutchison's belief was based on several factors, including recorded jail calls between Troy and Laceiara. Hutchison explained that during the phone calls, Troy and Laceiara identified themselves, and their conversations resembled those between long-term partners. Their conversations contained suggestions that they had recently seen each other in person. Specifically, during one call, Troy made a comment about "want[ing] to get" an item from Laceiara.

In forming her belief that Troy and Laceiara had been in contact, Hutchison also considered the children's genetic testing results, which indicated that Aziah's three younger siblings were her full biological siblings. Aziah's youngest brother was born in August 2024. Hutchison stated that Laceiara's story of how he was conceived changed over time. Initially, Laceiara stated that she "impregnated herself with a turkey baster so that she could be a surrogate to some friends." Later, she stated that she "had sex with someone at a party" and that Troy "happened to be at that same party." However, she "did not recall having sex with [Troy]." Hutchison further observed that

Laceiara had posted photos on Facebook referencing her children's father, and that a man appearing in those photos resembled Troy.

Finally, Hutchison interpreted Troy's statement that Aziah would recognize him if she saw him on the street as evidence that he had been in contact with Laceiara. This statement led Hutchison to believe that Troy had seen Aziah while she was placed with her mother.

Regarding the court-ordered genetic testing, Hutchison testified that Troy did not complete the testing. Additionally, as previously noted, during Hutchison's conversation with Troy in June 2024, he stated that it was not his responsibility to complete a paternity questionnaire and that it "would be on the mother to do that."

Hutchison testified that Troy failed to participate in other court-ordered services, including family support services, a batterer's intervention program, a psychological evaluation, outpatient therapy, and urinalysis testing. She stated that she expressed to Troy the importance of completing the batterer's intervention program, particularly due to the domestic violence incident that led to Aziah's removal. Hutchison further explained that Troy's lack of communication and involvement in the case prevented her from setting up services for him. However, Troy could have set up and completed the batterer's intervention program and outpatient therapy on his own.

Hutchison's testimony concluded with her overall assessment of Troy's progress throughout the case. At no point did she believe Aziah could return to Troy's care, as she did not "feel like he had done anything" to correct the condition that led to Aziah's removal and had not maintained "consistent communication" with DHHS. Hutchison also raised concerns about Troy's ability to parent Aziah. She stated:

> I mean, I just have no knowledge of what his ability is as a parent. Based on his report to me, he hasn't seen her since 2020. So I would have no reason to believe he knows how to parent a four-year-old. Aziah is in speech therapy[,] and making sure she is meeting those developmental milestones . . . [requires] a lot of attention. And I don't know that Troy would be able to provide that to her.

Overall, Hutchison opined that it was in Aziah's best interests to terminate Troy's parental rights.

### 3. JUVENILE COURT'S DECISION

In an order entered on October 10, 2024, the juvenile court made specific findings as to the evidence presented at trial. It stated:

> 3. Troy . . . has made no effort to comply with any of his Court orders in this matter in the approximate four years since the removal of his child.
> 4. Troy . . . has continued to have an ongoing relationship with the mother of the minor child . . . despite ongoing Court orders to have no contact with the mother due to concerns of domestic violence;
> 5. There have continued to be domestic violence incidents and arrests of [Troy] involving both the mother and at least one other woman since the child's initial removal in 2020; [and]
> 6. . . . [I]t is evident that Troy . . . had periods of unauthorized contact with the minor child when the minor child was temporarily placed with the mother from August of 2023 to February of 2024[.]

The court also found Rashawn and Hutchison to be credible witnesses.

The juvenile court considered each of the statutory grounds for termination alleged by the State and found that grounds for termination had not been proven pursuant to § 42-292(1) or (9). However, the court found by clear and convincing evidence that statutory grounds for termination existed pursuant to § 42-292(2), (6), and (7). The court also found that Troy was unfit, stating:

8. That Troy['s] . . . complete lack of engagement with the [c]ourt[-]ordered services, and outright defiance of other Court orders, including the order for supervised visitation with his child, shows he has no intention of taking steps to alleviate the safety concerns that existed at the time of the child's initial removal;

9. That Troy . . . has not put himself in a position to show that he has any intention of establishing or maintaining a meaningful relationship with his child; [and]

10. That Troy . . . has not taken any steps or made any efforts to secure his parental rights since the Court's involvement with his child started in 2020[.]

Finally, the court found that termination of Troy's parental rights was in the child's best interests, and it terminated his rights to Aziah.

## III. ASSIGNMENTS OF ERROR

Troy assigns, restated, that the juvenile court erred in finding that (1) statutory grounds existed to terminate his parental rights and (2) termination of his parental rights was in Aziah's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## V. ANALYSIS

In Nebraska, the grounds for terminating parental rights are codified in § 43-292. That statute contains 11 separate subsections, any one of which can serve as a basis for termination when coupled with evidence that termination is in the best interests of the child. *In re Interest of Mateo L. et al., supra*. It is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Mateo L. et al., supra*.

### 1. STATUTORY GROUNDS FOR TERMINATION

The State sought to terminate Troy's parental rights to Aziah under § 43-292(1), (2), (6), (7), and (9). The juvenile court found, by clear and convincing evidence, that grounds for termination existed under § 43-292(2), (6), and (7).

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." By the time the

motion to terminate Troy's parental rights was filed on June 6, 2024, Aziah had been in an out-of-home placement for approximately 43 months. Troy "does not contest the length of time Aziah remained out of the home, and that the statutory time frame is met." Brief for appellant at 15. We agree that the State has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for termination in this case. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning the other statutory bases for termination. *In re Interest of Mateo L. et al., supra*.

Troy argues, however, that even if the statutory time frame has been met, that it is nevertheless the State's burden to prove by clear and convincing evidence that the parent is unfit, and that the child's best interests must be considered. We agree, and we address those considerations next.

## 2. BEST INTERESTS

Under § 43-292, in addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

Troy argues that he has "identified that he wants to work towards reunification with Aziah." Brief for appellant at 18. He claims he "has not been provided the proper referrals or resources to work towards that goal." *Id*. However, the record shows that Hutchison made numerous efforts to contact him and establish consistent communication. But even when she was able to reach him, Troy's lack of follow-through and long periods of unresponsiveness made it difficult for her to provide services and make progress in the case. Further, the record reflects that Troy has not shown any interest in having a relationship with Aziah since her removal from his care in August 2020. He did not participate in supervised visitation, made no effort to attend her appointments, and did not attempt to communicate with her through cards, gifts, or letters.

Moreover, for nearly 4 years, Troy made no meaningful effort to engage in the court-ordered case plans. He did not obtain and maintain stable housing or a legal source of income, and he failed to participate in court-ordered services, including family support services, a batterer's intervention program, a psychological evaluation, outpatient therapy, and urinalysis testing. The record also suggests that Troy likely violated court orders that prohibited contact with

- 8 -

Aziah's mother, as there is evidence indicating that they continued a romantic relationship throughout the case. Notably, genetic testing revealed that Aziah's three younger siblings -- who were born after Aziah was removed from Troy's care -- are her full biological siblings. Troy's refusal to participate in services and his continued noncompliance with court orders show a clear unwillingness to address the underlying issues that led to Aziah's removal. Additionally, he has failed to provide any evidence that he would be able to meet Aziah's needs if she were returned to his care.

By the time of the termination hearing, Aziah had been in out-of-home-placement for nearly 4 years. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). And when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Leyton C. & Landyn C., supra*. The State proved that Troy was unfit, meaning that he has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the children's well-being. See *id.* We further find that there is clear and convincing evidence that it is in Aziah's best interests to terminate Troy's parental rights.

## VI. CONCLUSION

For the foregoing reasons, we affirm the order of the juvenile court terminating Troy's parental rights to Aziah.

AFFIRMED.