IN RE INTEREST OF WALTER W., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V.
MARTINA A., APPELLANT.
744 N.W.2d 55

Filed January 18, 2008.    No. S-07-393.

Marian G. Heaney, of Legal Aid of Nebraska, for appellant.

Regina T. Makaitis, Special Prosecutor, for appellee.

Sarah Helvey and Jennifer A. Carter for amicus curiae Nebraska Appleseed Center for Law in the Public Interest.

Mark C. Tilden, of Native American Rights Fund, and Marian G. Heaney, of Legal Aid of Nebraska, for amici curiae Yankton Sioux Tribe of South Dakota et al.

Shannon Smith, of Indian Child Welfare Law Center, and Padraic I. McCoy and Mandi L. Hill, of Faegre & Benson, L.L.P., for amicus curiae Indian Child Welfare Law Center.

HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

Martina A. appeals the separate juvenile court's order terminating her parental rights to her son, Walter W. He is an Indian child, so the Indian Child Welfare Act (ICWA) applies. The juvenile court initially terminated Martina's parental rights in September 2005. The Nebraska Court of Appeals vacated the termination order in July 2006 because the State had failed to give the Yankton Sioux Tribe proper notice before the termination hearing. After retrial in January and February 2007, the juvenile court again terminated Martina's parental rights. Martina appeals, arguing the State failed to meet its burden under ICWA.

ICWA requires the State to prove that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family."[1] The main issues are whether the State (1) must prove the "active efforts" element beyond a reasonable doubt or by clear and convincing evidence and (2) met its burden in proving this element. We affirm because we conclude the State met its burden of proving, by clear and convincing evidence, that the Department of Health

---

[1] 25 U.S.C. § 1912(d) (2000); Neb. Rev. Stat. § 43-1505(4) (Reissue 2004).

and Human Services (the Department) made active efforts to provide remedial services and rehabilitative programs.

## I. PROCEDURAL BACKGROUND

Martina gave birth to Walter on January 2, 2003. The following day, the State filed a supplemental petition. It alleged Martina placed him in a situation injurious to his health or morals. The petition alleged she was unable to provide safe, stable, and independent housing for herself and her child and that her use of alcohol or controlled substances placed Walter at risk for harm. At the time, Martina had five other children who were under the juvenile court's jurisdiction because of Martina's faults or habits. The juvenile court placed Walter in the Department's temporary custody. Evidence later showed that Walter tested positive for amphetamine at birth.

In January 2003, Martina informed the court that she was an enrolled member of the Yankton Sioux Tribe and that Walter's father was an enrolled member of the Omaha Tribe. Later that month, after a continued detention hearing, the court ordered that Walter would remain in the Department's temporary custody. In May, the court found that Martina was an enrolled member of the Yankton Sioux Tribe and that Walter was eligible for enrollment. The court ordered that ICWA and its Nebraska counterpart, the Nebraska Indian Child Welfare Act (NICWA), would apply in all future proceedings. In November, the Yankton Sioux Tribe filed a notice to intervene. According to the parties, the court never heard or granted the tribe's motion.

In April 2004, the court declared Walter a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2002). After a disposition and permanency planning hearing in July, the court ordered that Martina (1) complete an inpatient chemical dependency treatment program, (2) participate in outpatient chemical dependency treatment until admitted for inpatient treatment, (3) maintain safe and adequate housing and a legal source of income, and (4) complete psychological and psychiatric evaluations.

On December 9, 2004, the State moved for termination of Martina's parental rights. The court heard the motion in June 2005 and terminated Martina's parental rights in September.

Martina appealed. The Court of Appeals determined the termination hearing was invalid because the State had failed to give proper notice to the Yankton Sioux Tribe as required under ICWA.[2] The court vacated the termination order and remanded the cause to the juvenile court for further proceedings following proper notice to the Yankton Sioux Tribe.[3]

After receiving the mandate, the juvenile court ordered another hearing on the motion to terminate parental rights. The special prosecutor notified the Yankton Sioux and Omaha Tribes. The court held the hearing on January 31 and February 1, 2007. The Yankton Sioux Tribe did not appear. The court terminated Martina's parental rights in March.

## II. ASSIGNMENTS OF ERROR

Martina assigns, restated, that the juvenile court erred in terminating her parental rights because the State failed to meet its burden of proof. In her second assignment of error, Martina asserts that the Court of Appeals' dismissal in an unrelated case precluded her from appealing the adjudication in this case.

## III. STANDARD OF REVIEW

■ We review juvenile cases de novo on the record, and we reach our conclusions independently of the juvenile court's findings.[4]

## IV. ANALYSIS

■ To terminate parental rights, the State must prove by clear and convincing evidence that one or more of the statutory grounds listed in Neb. Rev. Stat. § 43-292 (Reissue 2004) have been satisfied and that termination is in the child's best interests.[5] NICWA, however, adds two additional elements the State must prove before terminating parental rights in cases involving Indian children. First, § 43-1505(4) provides an "active efforts" element:

---

[2] See In re Interest of Walter W., 14 Neb. App. 891, 719 N.W.2d 304 (2006).

[3] Id.

[4] See In re Interest of Destiny A. et al., ante p. 713, 742 N.W.2d 758 (2007).

[5] See In re Interest of Xavier H., ante p. 331, 740 N.W.2d 13 (2007).

> Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under state law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

Section 43-1505(4) is identical to its federal counterpart, 25 U.S.C. 1912(d). Second, Nebraska's § 43-1505(6) provides a "serious emotional or physical damage" element:

> No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

Section 43-1505(6) is identical to 25 U.S.C. § 1912(f).

### 1. THE STATE MET ITS BURDEN OF PROVING ACTIVE EFFORTS

Martina contends the State failed to prove that the Department made active efforts as required under ICWA.

#### (a) The "Active Efforts" Element Must Be Proved by Clear and Convincing Evidence

Before deciding whether the State met its burden in proving active efforts, we must first determine the standard of proof for this element. The language in § 43-1505(4) does not impose any particular standard of proof for the active efforts element. Section 43-1505(6), however, expressly requires the State to prove beyond a reasonable doubt that the child is likely to suffer serious emotional or physical harm if the parent retains custody.

Martina contends that the proper standard for the active efforts element is proof beyond a reasonable doubt. The State urges us not to adopt the "beyond a reasonable doubt" standard.

Martina directs our attention to *In re Interest of Phoenix L.*[6] In that case, the mother argued that a Nebraska Juvenile Code

---

[6] *In re Interest of Phoenix L.*, 270 Neb. 870, 708 N.W.2d 786 (2006), *disapproved on other grounds, In re Interest of Destiny A. et al., supra* note 4.

section violated equal protection. She argued that the statute only required clear and convincing evidence to terminate parental rights in a case involving non-Indian children but that § 43-1505(6) of NICWA required proof beyond a reasonable doubt. We concluded that "the lower standard of proof under § 43-279.01(3) for the termination of parental rights to non-Indian children, as opposed to the higher standard of proof under the NICWA, does not violate the equal protection rights of parents of non-Indian children."[7] In discussing the "beyond a reasonable doubt" standard, we cited only the "serious emotional and physical damage" element under § 43-1505(6) for terminating parental rights. And we did not mention the active efforts element or its standard of proof; that issue was not before the court. We decline to read *In re Interest of Phoenix L.* as requiring proof beyond a reasonable doubt for all elements of an ICWA case.

Other jurisdictions are split on what standard should apply. For instance, the South Dakota Supreme Court assumed the burden to prove the serious emotional and physical damage element—beyond a reasonable doubt—would apply to prove the active efforts element.[8] Other courts have declined to apply the "beyond a reasonable doubt" standard to the active efforts element.[9] We join this latter group.

■ Congress did not intend in 25 U.S.C. § 1912 to create a wholesale substitution of state juvenile proceedings for Indian children. Instead, in § 1912, Congress created additional elements that must be satisfied for some actions but did not require a uniform standard of proof for the separate elements. As discussed, Congress imposed a "beyond a reasonable doubt" standard for the "serious emotional or physical damage" element in parental rights termination cases under § 1912(f). Congress also imposed a "clear and convincing" standard of proof for the "serious emotional or physical damage" element

---

[7] *Id.* at 884, 708 N.W.2d at 797-98.

[8] *People in Interest of S.R.*, 323 N.W.2d 885 (S.D. 1982).

[9] See, e.g., *Matter of Baby Boy Doe*, 127 Idaho 452, 902 P.2d 477 (1995); *In re M.S.*, 624 N.W.2d 678 (N.D. 2001); *In re Annette P.*, 589 A.2d 924 (Me. 1991).

in foster care placements under § 1912(e). The specified standards of proof in subsections § 1912(e) and (f) illustrate that if Congress had intended to impose a heightened standard of proof for the active efforts element in § 1912(d), it would have done so. Because it did not impose a heightened standard of proof, we decline to interpret § 1912(d)—and its Nebraska counterpart, § 43-1505(4)—as requiring the State to prove active efforts beyond a reasonable doubt. Instead, we conclude that the element requires proof by clear and convincing evidence in parental rights termination cases—the standard required for terminating parental rights under Nebraska law.

### (b) The State Produced Sufficient Evidence to Find the Department Made Active Efforts

Martina contends the Department failed to make active efforts to provide remedial services and rehabilitative programs. Section 43-1505(4) is imprecise. The section provides that a party seeking to terminate parental rights to an Indian child "shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." This language sets out praiseworthy but vague goals for the courts to enforce. It fails to give us guidance in determining whether the Department's efforts were sufficient to meet ICWA's mandates.

We do know, however, that the "active efforts" standard requires more than the "reasonable efforts" standard that applies in non-ICWA cases.[10] And at least some efforts should be "culturally relevant."[11] Even with these guidelines, there is no precise formula for "active efforts." Instead, the standard requires a case-by-case analysis.[12]

Martina asserts that the Department's efforts consisted largely of "'encouragement and referrals,'"[13] which she argues did not amount to active efforts.

---

[10] See 390 Neb. Admin. Code, ch. 5, § 004.02D (1998).

[11] See id.

[12] See Matter of Baby Boy Doe, supra note 9.

[13] Brief for appellant at 27.

We begin by noting that the Department was unable to contact Martina from June 2003 until March 2004 because her whereabouts were unknown. It would have been impossible for the Department to provide services during that time.

After the Department regained contact with Martina, it tried to provide remedial services and rehabilitative programs. For instance, the case manager contacted inpatient chemical dependency treatment programs to verify the types of programs and program admittance requirements. The case manager gave Martina information about the programs and encouraged her to apply for programs she had not already considered. The case manager faxed necessary records to the programs at Martina's request. The record reflects that Martina told the case manager she was contacting one program weekly to gain admittance. Yet, when the case manager contacted the program, he was told Martina had not contacted the program in almost 2 months.

The case manager also encouraged Martina to attend an outpatient chemical dependency treatment program and gave her a packet of resources she could contact for outpatient treatment. On at least four occasions, he provided Martina a list of several community resources that could help with job skill development. He also gave Martina packets of community resources to obtain a psychiatric evaluation and referred her to a psychologist for a psychological evaluation.

For housing, the case manager reviewed a list of homeless shelters with Martina in August 2004 after she moved out of an apartment she was sharing with a roommate. He provided a telephone at the state office building so she could secure a bed at a shelter. In September, he gave Martina a letter addressed to the Omaha Housing Authority stating she was in need of housing to comply with her case plan. After Martina told him she intended to apply for assistance through the Omaha Housing Authority, he offered bus tickets for transportation to the Omaha Housing Authority office. Martina stayed at the Siena/Francis House shelter until October, when she was asked to leave the shelter because she was intoxicated. The case manager again reviewed a list of homeless shelters with Martina.

Besides these efforts, the Department provided Martina vouchers for rent, clothing, an electric bill, and drug testing;

bus tickets for transportation to Alcoholics Anonymous and Narcotics Anonymous appointments and to other services; and visitation with Walter, transportation of Walter for visitation, and foster care and medical care for Walter.

Martina points out some areas where the Department's efforts may have fallen short. First, Martina called a Department protection and safety administrator to testify at the second termination trial. When given a series of hypotheticals, this witness provided testimony suggesting that, from a Department policy standpoint, the case manager's efforts in some areas may not have constituted active efforts. Martina also points out that the agency the Department hired to provide visitation services missed or canceled multiple visits during a 5-month period in 2004. She also argues that she had trouble gaining admission to inpatient treatment programs. So, she argues that the case manager should have explored other services throughout Nebraska and Iowa or that he should have returned to the court to seek an amended case plan. And, she argues the Department should have tried to place Walter with relatives and should have created a written cultural plan for him that addressed his specific heritage. Although the case manager did not create a *written* cultural plan, he did discuss a cultural plan with the foster mother. We acknowledge, however, that the Department could have created a plan that better incorporated specific elements of Walter's heritage.

Although the Department could have taken more progressive actions in some of its efforts, we are satisfied that considering the entire record, the Department made active efforts to provide remedial services and rehabilitative programs to prevent the breakup of the Indian family. We conclude the State proved by clear and convincing evidence that the Department made active efforts.

### 2. The State Met Its Burden in Proving Walter Would Likely Suffer Harm if Returned to Martina

As explained above, § 43-1505(6) requires a "determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious

emotional or physical damage to the child." Martina argues that testimony by the State's expert failed to support, beyond a reasonable doubt, a finding that Walter's return to Martina is likely to cause Walter serious emotional or physical damage.

At the disposition hearing in July 2004, Dr. Kevin Cahill, a clinical psychologist, testified about whether the return of Walter to Martina at that time would result in serious emotional or physical damage to Walter. The parties stipulated to Cahill's qualifications as an expert under ICWA. An exhibit at the second termination hearing included his July 2004 testimony.

Cahill identified concerns that could affect Martina's ability to provide competent parenting for Walter. He stated that depression was an ongoing problem for Martina and that depressed parents are at a "very high risk" for neglecting their children.

He also expressed concern because a January 2002 evaluation showed narcissistic traits. He explained that for a narcissistic individual, "the needs of one's self always come first and everything else is secondary." He explained one of the primary minimal competencies an effective parent must have is the ability to "relegate the importance of one's own needs to the primacy of the child's needs."

Cahill further noted that Martina had been identified with an intermittent explosive disorder. He testified that "an individual with an intermittent explosive disorder is likely to simply blow up in rage and anger at intervals, sometimes with very little provocation or in response to a provocation that seems completely out of proportion to the level of response." He explained that such tendencies conflict with another minimal competency for parenting—the ability to withstand the frustrations of parenting without becoming overly reactive.

Cahill also testified at the first trial to terminate Martina's parental rights, and this testimony was included in an exhibit at the second trial. To prepare for the trial, Cahill reviewed a psychological evaluation from another psychologist dated December 2004. He stated the report increased his concerns about Martina's mental health. The other psychologist had made some additional diagnoses that had not previously been made. The other psychologist diagnosed Martina as dependent on methamphetamine, having an impulse control disorder,

possible posttraumatic stress disorder, and a history of bipolar disorder. He also diagnosed her with antisocial personality disorder. Cahill explained that personality disorders are typically lifelong, even though the patient can mitigate the intensity of some symptoms. Later in his testimony, Cahill opined that Martina would not make enough progress to provide permanency for Walter. He also opined that the return of Walter to Martina would result in "serious psychological and potentially physical damage."

On cross-examination, Martina's counsel challenged Cahill's reliance on the December 2004 psychological report because the report contained a test that could be skewed for members of different ethnicities, including Native Americans. For instance, Native Americans typically score higher on the scale that measures antisocial personality disorder. Cahill acknowledged the report did not expressly state that the authoring psychologist used a correction scale or information regarding the Native American population to interpret the results of the test.

Martina now contends that Cahill's testimony failed to show beyond a reasonable doubt that Walter's return to Martina would likely result in serious emotional or physical harm. She argues the testimony failed to support the "beyond a reasonable doubt" standard in part because of Cahill's reliance on the December 2004 report. She also claims the State failed to give Cahill evidence of her negative drug tests. She further claims the State failed to give Cahill a chemical dependency counselor's opinion that she had remained sober between May and August 2004.

After considering Martina's contentions and reviewing the record, including Cahill's testimony, we conclude the State proved beyond a reasonable doubt that returning Walter to Martina is "likely to result in serious emotional or physical damage" to Walter. Setting aside Martina's history of drug use, we note a likelihood that Martina's mental health issues could cause harm to Walter.

### 3. THE STATE PROVED THAT TERMINATING MARTINA'S PARENTAL RIGHTS WAS IN WALTER'S BEST INTERESTS

Martina contends that the State's expert testimony was "insufficient to establish, beyond a reasonable doubt, that termination

was in [Walter's] best interests."[14] She again argues that Cahill lacked information in forming his opinion, specifically, evidence regarding negative drug tests and the counselor's opinion about her sobriety. She also argues that before a best interests determination can be made, it is necessary to know whether the child will be placed in a home consistent with ICWA placement preferences. She argues the State failed to give Cahill information about Walter's likely permanent placement.

■ As explained above, the best interests element is imposed by state law and generally requires proof by clear and convincing evidence. We decline to extend the heightened standard in § 43-1505(6) to all elements of an ICWA parental rights termination case. Just as we did not apply the heightened standard to the active efforts element, we will not apply the heightened standard to the state law elements under § 43-292 for terminating parental rights. As noted by the Utah Court of Appeals, "ICWA does not preempt any state law grounds for termination of parental rights or impose a single burden of proof on all supporting findings in termination proceedings in which it applies."[15] We note that in *In re Interest of C.W. et al.*,[16] we "[found] that the State [had] prove[d] beyond a reasonable doubt that the best interests of the children require[d] termination of [the mother's] parental rights." This language appears in dicta, and to the extent it suggests the State must prove the best interests element beyond a reasonable doubt, we disapprove this language. Therefore, we hold that the State must prove by clear and convincing evidence that terminating parental rights is in the child's best interests; this need not include testimony of a qualified expert witness. Martina's argument that the State's expert testimony was insufficient to establish the best interests element beyond a reasonable doubt is without merit.

---

[14] Brief for appellant at 35.

[15] *K.E. v. State*, 912 P.2d 1002, 1004 (Utah App. 1996). See, also, *In re M.S., supra* note 9; *In re Interest of D.S.P.*, 166 Wis. 2d 464, 480 N.W.2d 234 (1992); *In re Bluebird*, 105 N.C. App. 42, 411 S.E.2d 820 (1992).

[16] *In re Interest of C.W. et al.*, 239 Neb. 817, 831, 479 N.W.2d 105, 115 (1992).

■ When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the child's best interests require termination of parental rights.[17] The court originally removed Walter from Martina's custody because of her illegal drug use. With Martina's history of drug abuse, we are concerned that she failed to complete requested urinalysis screenings. We recognize that Martina submitted some negative urinalysis screenings in 2004 and 2005. But between January and May 2005, she failed to complete 10 urinalysis screenings that the case manager requested.

In addition to the missed urinalysis screenings, the record shows that Martina has not acquired the responsibility needed to parent a child. For instance, in October 2004—2 weeks before Martina delivered her next child—she was asked to leave the shelter where she was staying because she was intoxicated. In June 2006, she called the case manager seeking advice on how to keep custody of any other children she might have. She told the case manager she was living with a man she had previously lived with and wondered if that would affect her ability to keep custody of any other children. This man was about 20 years old and a former ward of the State. Martina had reported in 2004 that she asked him to leave her home because he admitted to sexually abusing another child when he was 12 years old. Viewed through the lens of life's experiences, these two examples illustrate that Martina does not appreciate the responsibilities of parenting.

The record also shows that the director of ICWA affairs for the Yankton Sioux Tribe attended a foster care review board meeting in October 2004. A report created after the meeting stated, in part: "[The director] indicated that permanency for Walter is of utmost importance. He indicated that the tribe would not object to termination of [Martina's] rights, as [the tribe] would like Walter to be adopted." Similarly, Cahill opined that based on Martina's diagnoses and her history, she cannot provide permanency for Walter.

■ When the court first terminated Martina's parental rights in September 2005, Walter had spent his entire life, 2½ years,

---

[17] See *In re Interest of Destiny A. et al.*, *supra* note 4.

in foster care. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity.[18] We conclude the State provided clear and convincing evidence that terminating Martina's parental rights is in Walter's best interests.

### 4. WE DO NOT REACH THE MERITS OF MARTINA'S SECOND ASSIGNMENT OF ERROR

As her second assignment of error, Martina argues that the court erred at the adjudication stage because she claims ICWA requires a finding of active efforts at adjudication and the court did not make such a finding. We have stated that a proceeding before a juvenile court is a "special proceeding" for appellate purposes.[19] We have further held that a judicial determination following an adjudication in a special proceeding which affects the substantial right of parents to raise their children is a final, appealable order.[20] Martina did not appeal the court's adjudication order.

Martina, however, argues "[t]his issue cannot be dismissed as a collateral attack on a final order from which [she] failed to perfect an appeal."[21] She claims the Court of Appeals' dismissal of an appeal in an unrelated case precludes appeals from adjudications or dispositions in ICWA cases.[22] Martina's belief that the unrelated Court of Appeals' dismissal precluded her appeal in the present case does not excuse her failure to appeal the adjudication order. Martina could have asked the Court of Appeals to overrule its prior ruling. Because Martina failed to appeal the adjudication order, we will not address her arguments about alleged errors at the adjudication stage.

---

[18] See *id.*

[19] *In re Interest of Ty M. & Devon M.*, 265 Neb. 150, 655 N.W.2d 672 (2003).

[20] *Id.*

[21] Brief for appellant at 40.

[22] See *In re Interest of David T.*, 12 Neb. App. xlii (No. A-03-589, Nov. 5, 2003).

## V. CONCLUSION

We conclude that in termination of parental rights cases, the standard of proof for the "active efforts" element in § 43-1505(4) is proof by clear and convincing evidence. We determine that the State proved by clear and convincing evidence that the Department made active efforts. We also conclude that the State met its burden in proving the "serious emotional or physical damage" element and that terminating Martina's parental rights is in Walter's best interests. Because Martina failed to appeal the adjudication order, we do not reach the merits of her second assignment of error.

AFFIRMED.