IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF A.Z.P.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF A.Z.P., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

AMBER B., APPELLANT, AND RONALD P. AND INDIAN CHILD WELFARE YANKTON SIOUX TRIBE OF
SOUTH DAKOTA, APPELLEES.

Filed August 19, 2025.    No. A-24-922.

Appeal from the County Court for Madison County: ROSS A. STOFFER, Judge. Affirmed.

Bradley C. Easland, of Egley, Fullner, Montag, Morland & Easland, P.C., for appellant.

Nathan T. Eckstrom, Deputy Madison County Attorney, and Alissa M. Baier, of Galyen Boettcher Baier, P.C., L.L.O., for appellee State of Nebraska.

PIRTLE, BISHOP, and FREEMAN, Judges.

PIRTLE, Judge.

## I. INTRODUCTION

Amber B. appeals the order of the Madison County Court, sitting as a juvenile court, that terminated her parental rights to her 5-year-old son. Upon our de novo review, we affirm the juvenile court's order.

## II. BACKGROUND

### 1. FACTUAL BACKGROUND

Amber is the mother of four children. C.B. was born in 2004, E.C. was born in 2007, A.K.P. was born in 2014, and A.Z.P. was born in 2019. This matter only concerns A.Z.P. Amber and A.Z.P. are both members of the Yankton Sioux Indian Tribe.

In June 2020, Amber and her children moved from South Dakota to Norfolk, Nebraska. On September 14, the Nebraska Department of Health and Human Services (DHHS) received a report that Amber was verbally abusing her children while using hydrocodone, methamphetamine, marijuana, and alcohol. The report also claimed the house was unclean and covered with dirty laundry, garbage, and dishes.

On September 23, 2020, a DHHS representative interviewed Amber, her brother, Bruce, and her two older children at various locations. Prior to speaking with Amber in her home, the representative noticed two people leaving her bedroom. After being asked who they were, Amber admitted to having sexual relations with them while Bruce cared for A.Z.P. Amber then told the representative she used to use methamphetamine but had not done so since moving to Nebraska. However, she admitted to still using marijuana and drinking a pint of vodka every night when she could afford to. Following this encounter, Amber began to receive voluntary services from DHHS.

On August 24, 2021, Amber was cited for third degree assault for punching a neighbor in the face during an argument about money. Then sometime around December 2021, Amber claimed Bruce was sexually assaulting her children. Because she subsequently missed several scheduled forensic interviews, a DHHS representative went to her house on December 20. Upon arriving at the residence, the representative discovered a marijuana pipe and other drug paraphernalia on the table next to where the children were playing video games. Law enforcement was called and Amber was cited for possession of drug paraphernalia and child abuse. The children were eventually interviewed on December 28 concerning the sexual assault allegations. While they all denied the allegations, A.K.P. discussed how Amber had previously smoked marijuana in front of him.

On January 13, 2022, Amber agreed to participate in noncourt services and was assigned a case manager. Over the next several months, Amber struggled with her mental health. On February 24, she told her caseworker she was second guessing her sanity, believed her children were being sexual toward one another, thought E.C. was being sexual toward the man she was seeing, and indicated she wanted to sign her rights to E.C. over to Bruce. Several weeks later, on March 4, Amber informed her case manager that she no longer wanted E.C. to live with her because he tried "feeling up on her legs." She later expressed that around this time, she thought E.C. was sexually abusing A.Z.P., and said she was going to kill him if he did anything to the others. She later agreed to sign a temporary delegation of parental powers concerning E.C. so he could live with an aunt.

On March 9, 2022, Amber's case manager visited her after learning that she told officials from her tribe that "she couldn't do this anymore." Upon arriving at her residence, the caseworker heard Amber screaming at A.K.P. She then accused A.K.P. of sexually touching A.Z.P., called him vulgar names, and told the caseworker that if she did not take A.K.P. with her she would kill him. After law enforcement was called and Amber was taken to a local hospital, the caseworker discovered a drawing of a middle finger on Amber's bedroom wall. Below this image was a message that stated, "RIP [E.C.]" that listed his date of birth and March 9, 2022, as his date of death.

On March 20, 2022, the State filed a juvenile petition that alleged A.Z.P. was within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). The State also requested the court grant an ex parte order giving DHHS temporary custody of A.Z.P. The court granted the ex parte order

on the same day and A.Z.P. was removed from Amber's home and placed in the temporary care of DHHS. Amber eventually entered an admission to the juvenile petition in May 2022.

On April 9, 2022, Amber went to a neighbor's apartment and tried to punch her. After the woman got away, Amber took a knife and swung it at her. The woman's 4-year-old child was present throughout this incident. Amber later articulated during a psychological evaluation that she attacked the woman because she believed spirits were attacking her children and that the mother was not protecting them.

Amber was later arrested on April 10, 2022, on several charges including second degree assault, use of a deadly weapon, terroristic threats, child abuse, and shoplifting. Because she was unable to make bond, she remained in custody until September 3 when she was sentenced to 3 to 5 years' imprisonment. Throughout the time she was imprisoned, Amber consistently wrote letters to her children. She also participated in bimonthly supervised zoom visits with A.Z.P. and E.C. She was eventually paroled on April 24, 2024. However, the State had already filed a supplemental petition to terminate her parental rights to A.Z.P. several weeks previously on April 9. On May 10, Amber entered a denial to the supplemental petition.

2. TERMINATION HEARING

A termination hearing was scheduled for July 9, 2024. However, on that date, Amber was acting unusual prior to the hearing. As a result, the court ordered her to take a urinalysis drug test which returned presumptive positive for nofrentanyl and methamphetamine. However, it was later revealed that one of her medications could return a false positive for fentanyl. But because the same was not true for the presumptive positive methamphetamine result, the sample was sent to a laboratory for more conclusive testing. The hearing was then continued for 2 days and Amber was held in contempt and kept in custody. Several weeks later, the laboratory reported that it was unable to verify or refute the presumptive positive test result because Amber's urine sample was not large enough.

The rescheduled hearing took place on July 11, 2024. Six witnesses, including Amber, testified at the hearing.

Veronica Roberts was assigned as Amber's DHHS case manager in April 2022 and has worked with her ever since. Amber's goals since Roberts became involved with her case were to provide a safe, stable, and nurturing environment for her children free from cursing, yelling, and accusations. To help achieve these goals, Amber completed a psychological evaluation in August 2022 and enrolled in therapy while in prison. Following the psychological evaluation, Amber was diagnosed with schizophrenia, amphetamine use disorder, alcohol use disorder, opioid use disorder, cannabis use disorder, and a possible antisocial personality disorder.

Roberts explained that during the time Amber was imprisoned, she had bimonthly virtual supervised visits with A.Z.P. She stated that Amber never missed these visits and generally acted appropriately during them. Amber also frequently wrote letters to her older children. But Roberts explained that some of these letters were inappropriate, particularly the ones she sent to E.C. Specifically, Roberts was concerned about Amber calling E.C. "little pimp" and her "little hubby." She also discussed how Amber was putting too much responsibility on E.C. by expecting him to take care of his siblings. But after Roberts spoke to Amber about her concerns, she had no further issues with the letters.

After Amber was paroled in April 2024, she continued to have bimonthly virtual visits with A.Z.P. Around this time, she also requested to have in-person visits which Roberts attempted to arrange. However, before the visits could occur, Amber tested presumptive positive for fentanyl. It was later determined that this was a false positive that was probably caused by one of her medications. Following this, the in-person visits never occurred because the supplemental petition to terminate Amber's parental rights had already been filed. Roberts explained that she did not attempt to schedule in-person visits at this time because forming a connection with Amber could potentially harm A.Z.P. if her parental rights were later terminated.

Despite Amber generally cooperating with DHHS, Roberts believed her parental rights should be terminated. Her primary concerns involved Amber's continued mental health problems and her unstable housing situation. More specifically, Roberts discussed past conversations with Amber where she spoke about seeing a dragon spirit. During one of these conversations while she was incarcerated, Amber informed her that the dragon also got her pregnant. While Roberts had not heard about the dragon since Amber was paroled, they had a conversation sometime around June 2024 where Amber told her that she was the "devil's daughter." There was also a previous incident involving the children where Amber told E.C. that "the spirits put her on this world to get rid of bad people." In regard to her housing after being released from prison, Amber was required by probation to live in a sober-living house in Lincoln. Roberts explained this made reunification difficult because the facility did not typically allow children to live there.

Roberts also discussed the active efforts DHHS made in its attempt to reunify Amber and A.Z.P. These efforts included providing the psychological evaluation, individual therapy, medications, case management, family support, parenting courses, virtual visitations, and sibling visits. Additionally, Roberts maintained regular contact with Amber and spoke with her multiple times per week. She also made efforts to speak with Amber's tribe to arrange for A.Z.P. to live with a relative but was ultimately unsuccessful.

Overall, Roberts did not believe A.Z.P. would be safe with Amber. While she believed that reunification could eventually be possible, she stated it would require time and a lot of effort from Amber. With this, she noted that it had already been more than 2 years since Amber last saw A.Z.P. in person. In this time, A.Z.P., who was now 5 years old, was doing well with his foster family and no longer viewed Amber as his mother. More so, Roberts was also concerned about Amber's untreated mental health problems and her testing presumptively positive for methamphetamine at the prior hearing. Given these ongoing concerns and Amber's lack of a meaningful relationship with A.Z.P., Roberts believed it was in A.Z.P.'s best interests to terminate her parental rights.

Cory Rabe is a psychiatric mental health nurse practitioner who began seeing Amber in May 2024. At the time of the hearing, he had only met with her twice. During these two sessions, he diagnosed her with schizophrenia, post-traumatic stress disorder, moderate alcohol use disorder in sustained remission, mild cannabis use disorder in sustained remission, an unspecified severe stimulant use disorder in sustained remission, and a possible antisocial personality disorder.

Rabe stated that he diagnosed Amber with schizophrenia because she had experienced both hallucinations and delusions within the last several months. He testified that her hallucinations typically consist of seeing dragons and spirits and hearing voices that are not there. He then said her belief about her father being the devil was an example of delusional thinking. He testified that

these hallucinations and delusions had a significant negative impact on her ability to function. To help treat her symptoms, he prescribed Amber an antipsychotic medication.

Dawn B. is A.Z.P.'s foster mother. She testified that A.Z.P. has been living with her family since March 30, 2022. In that time, he has generally been doing well but required two surgeries due to ongoing problems with frequent nosebleeds. He was also currently receiving speech and occupational therapy. Dawn then discussed how she and her husband were trying to provide A.Z.P. with opportunities to learn about his Native American heritage. With this, they had been in contact with a local tribe and were planning to attend a powwow in the next month.

Patricia LaCroix is a member of the Yankton Sioux Tribe and a certified tribal legal advocate. She has testified as a qualified expert witness many times since 2012 in Nebraska, South Dakota, North Dakota, Iowa, and Minnesota. She has also helped coordinate family visits, drug tests, and social services while working with another tribe, the Santee Sioux Nation.

LaCroix explained that after reviewing all the proceedings, exhibits, testimonies, and materials from this matter, she would be concerned if A.Z.P. was placed with Amber. She testified that while many Native American tribes have traditions involving a spirit world, Amber's hallucinations were not reflective of those customs. Specifically, she stated the Yankton Sioux Tribe did not have any traditions involving dragons nor had any customs to support Amber's belief that her father was the devil or that "the spirits put her on this world to get rid of bad people." In contrast to Amber's beliefs, LaCroix explained the spirits within their traditions were peaceful, benign, and harmonious. Due to Amber's history of substance abuse and because her hallucinations were not reflective of the tribe's beliefs surrounding the spirit world, LaCroix testified that if A.Z.P. resided with Amber, he would likely suffer serious emotional or physical damage.

Scott Lambrecht is the executive director of a local nonprofit, the Parent to Parent Network. He began voluntarily assisting Amber in December 2021 after receiving a report from the children's school that she needed help. Until the children were removed in March 2022, Lambrecht met with Amber weekly, helped her find support groups, get enrolled in counseling, and find transportation. He also remained in contact with her while she was imprisoned. He stated that in the time he has known her, Amber was always receptive to his suggestions and cooperated with the services he arranged. When asked, Lambrecht was familiar with Amber's hallucinations involving dragons. He said the dragons were a relatively new thing and had only started after she was incarcerated.

Amber testified last. She spoke about the steps she has taken to improve herself in the last several years. While incarcerated, she completed her GED, took a restorative justice class, completed a nonviolent conflict resolution class, completed a parenting course, participated in a substance abuse treatment program, and did bimonthly virtual visits with A.Z.P. When she was released, she attempted to see a therapist and obtain housing through her tribe but was placed on waitlists for both. Since then, she obtained full-time employment, started seeing a therapist, and was working to complete an eight-session anger management course. She testified that she has not missed any drug tests since being put on probation and that she has been sober since April 2022.

While talking about her therapy sessions with Rabe, she discussed how she started taking new medications which seemed to help her anxiety and nightmares. But she did not know this medication was an antipsychotic nor that she was diagnosed with schizophrenia. And although she

claimed to consistently see and communicate with a "liter[al] dragon, in spirit form" who helped her make decisions, she denied having hallucinations. She testified that the dragon was in the room with them at the hearing, but said she did not want to talk about it because the attorneys were trying to make her appear crazy.

Following the hearing, Amber was successfully released from parole on September 10, 2024.

### 3. JUVENILE COURT'S ORDER

On November 13, 2024, the juvenile court issued an order terminating Amber's parental rights to A.Z.P. The order determined the State proved a statutory basis for termination under Neb. Rev. Stat. § 43-292(7) (Reissue 2016) existed because A.Z.P. had been out of Amber's care for 15 of the most recent 22 months. It then determined that terminating her parental rights was in A.Z.P.'s best interests. The Court also determined the State met its burden to prove the additional requirements under the Nebraska Indian Child Welfare Act (ICWA). It first found the State proved by clear and convincing evidence that DHHS made active efforts to prevent the breakup of the Indian family and that those efforts were unsuccessful. It next determined that the State proved beyond a reasonable doubt, and through LaCroix's testimony as a qualified expert witness, that Amber's continued custody of A.Z.P. would likely result in his serious emotional and physical damage.

Amber now appeals the termination of her parental rights.

## III. ASSIGNMENTS OF ERROR

Restated and reordered, Amber assigns that the juvenile court erred in determining the State met its burdens to prove that (1) active efforts had been made to prevent the breakup of the Indian family and that those efforts were unsuccessful; (2) her continued custody of A.Z.P. was likely to result in his serious emotional or physical damage; (3) DHHS provided reasonable efforts to reunify her with A.Z.P.; and (4) terminating her parental rights was in A.Z.P.'s best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases, including those under ICWA, de novo on the record and reaches its conclusions independently of the juvenile court's findings in a termination of parental rights case. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024).

## V. ANALYSIS

Termination of parental rights is a two-part inquiry. The juvenile court must first find by clear and convincing evidence that one of the statutory grounds under § 43-292 is met and second that termination is in the child's best interests. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016).

In cases involving Indian children, ICWA adds two additional elements the State must prove before terminating a parent's parental rights. *In re Interest of Cameron L. & David L., supra*. First, the State must prove by clear and convincing evidence that active efforts have been made to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. *Id.* See Neb. Rev. Stat. § 43-1505(4) (Reissue 2016). Second, the State must prove by evidence beyond a

reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. *In re Interest of Cameron L. & David L., supra*. See § 43-1505(6).

1. ICWA

Amber's first two assignments of error relate to the State's compliance with ICWA.

(a) Active Efforts

Amber's first assignment asserts the juvenile court erred in determining that the State proved by clear and convincing evidence that active efforts had been made to prevent the breakup of the Indian family and that those efforts were unsuccessful. She essentially asserts that because the petition to terminate her parental rights was filed before she was released from prison, she was not given a meaningful opportunity to make any changes or work toward reunification.

The "active efforts" standard under the ICWA termination of parental rights provision requires more than the "reasonable efforts" standard that applies in cases involving non-Indian children. *In re Interest of Walter W.*, 274 Neb. 859, 865, 744 N.W.2d 55, 61 (2008). To constitute "active efforts" under ICWA, the termination of parental rights provision requires at least some of the active efforts should be "culturally relevant." *Id.* The "active efforts" standard under the ICWA termination of parental rights provision requires a case-by-case analysis. *In re Interest of Nery V. et al.*, 22 Neb. App. 959, 864 N.W.2d 728 (2015). Active efforts are required even if the parent is incarcerated, but may include programs offered by the Department of Correctional Services. See *In re Adoption of Micah H.*, 301 Neb. 437, 918 N.W.2d 834 (2018).

In *In re Interest of Louis S. et al.*, 17 Neb. App. 867, 774 N.W.2d 416 (2009), *abrogated on other grounds, In re Interest of Zylena R. & Adrionna R.*, 284 Neb. 834, 825 N.W.2d 173 (2012), the Nebraska Supreme Court distinguished between active and passive efforts in a case involving Indian children. It cited an Alaska Supreme Court opinion which stated:

> Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. Active efforts, the intent of the drafters of the [ICWA], is where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own.

*In re Interest of Louis S. et al.*, 17 Neb. App. at 880, 774 N.W.2d at 426-27 (quoting *A.A. v. State*, 982 P.2d 256, 261 (Alaska 1999). The court then listed some of the active efforts DHHS provided the mother in that case. These efforts included placing the children in foster care, helping the mother find housing, providing supervised visitations, a chemical dependency evaluation, drug testing, and individual therapy. *In re Interest of Louis S. et al., supra.* It also noted the children were provided with tutoring, speech therapy, and sibling visitation. *Id.*

In the present matter, we determine the State proved by clear and convincing evidence that DHHS made active efforts to prevent the breakup of the family. After Amber was incarcerated, DHHS placed A.Z.P. in foster care, arranged for Amber to complete a psychological evaluation, and provided virtual visitations and sibling visits. DHHS also contacted Amber's tribe to arrange for A.Z.P. to live with a relative, which was ultimately unsuccessful. Also, throughout this time, Roberts actively managed Amber's case, provided family support, remained in weekly contact

with her, provided a coverage worker to meet with her regularly in Lincoln, and helped her send letters to her children.

Moreover, the Department of Correctional Services offered Amber additional opportunities to complete her GED, a nonviolent conflict resolution class, a restorative justice class, a parenting course, and a substance abuse treatment program. Once Amber was paroled, DHHS continued to provide her with bimonthly virtual visits, individual therapy, and family support. We also note that A.Z.P. was provided occupational and speech therapy throughout this time. Additionally, he was given the opportunity by his foster parents to attend local Native American activities.

Although the State's petition to terminate Amber's parental rights was filed before her release from prison, given the resources provided to her and A.Z.P., we cannot conclude that the State failed to make active efforts to offer remedial services and rehabilitation programs designed to prevent the breakup of the family. Therefore, we conclude the juvenile court did not err in finding that the State proved active efforts were made by clear and convincing evidence.

### (b) Serious Emotional or Physical Damage

Amber next assigns that the juvenile court erred in determining the State met its burden to prove beyond a reasonable doubt, and supported by qualified expert testimony, that her continued custody of A.Z.P. was likely to result in his serious emotional or physical damage. She also asserts this finding was not supported by a qualified expert witness because LaCroix did not meet the requisite qualifications. She argues Lacroix was unqualified because she never met Amber or A.Z.P. and was not a licensed mental health practitioner.

We first address Amber's assertion that LaCroix was not qualified to be an expert witness. Relevant to this proceeding, Neb. Rev. Stat. § 43-1503(15)(a) (Reissue 2016) provides that for the purposes of ICWA, a qualified expert witness shall mean "A member of the Indian child's tribe or tribes who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family and childrearing practices." LaCroix testified that she was a member of the Yankton Sioux Tribe, a certified tribal legal advocate, and had been giving testimony as a qualified expert witness for ICWA since 2012. Additionally, she described her extensive experience working with Indian families, including coordinating family visits, drug testing, and social services. Based on LaCroix's credentials, which demonstrate she is a member of Amber's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family and childrearing practices, we cannot say that the district court abused its discretion in finding her to be a qualified expert witness for the purposes of ICWA.

We next address whether the State proved beyond a reasonable doubt that Amber's continued custody of A.Z.P. was likely to result in his serious emotional or physical damage. We first note that LaCroix testified that she believed A.Z.P. would be in danger of serious emotional or physical damage if left in Amber's custody. Although she did not specify exactly why she believed that to be true, we determine her conclusion is supported by the record beyond a reasonable doubt.

The evidence demonstrates that before Amber was incarcerated, she was suffering from severe delusions that led to her threatening the lives of her children and others. While Amber has since taken advantage of the many resources offered to her, she continues to not recognize the severity of her mental health problems. She still makes comments about how she is the daughter

of the devil and how she was placed in this world by spirits "to get rid of bad people." Further, despite admitting to seeing a spiritual dragon who helps her make decisions, she denies having hallucinations. This conduct, along with her not realizing that she was diagnosed with schizophrenia by two mental health practitioners raises serious concerns about her mental state. Given the violent incidents from her past that were triggered by similar delusions, we determine the juvenile court did not err in finding that A.Z.P. would likely be in danger of serious mental or physical damage if placed in Amber's custody.

### 2. STATUTORY GROUNDS

Although Amber does not contest that a statutory ground was met to terminate her parental rights under § 43-292, for the sake of completeness, we conclude the statutory ground under § 43-292(7) was met. There are 11 bases for parental termination under § 43-292. Only one must be met to provide the statutory basis for termination. See *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). Once one of the bases is met, the appellate court does not need to consider the sufficiency of evidence concerning the State's other bases for termination. *Id.*

Subsection (7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019).

The evidence demonstrates that A.Z.P. was removed from his parental home on March 29, 2022, and has been in DHHS custody ever since. Accordingly, when the motion to terminate Amber's parental rights was filed in April 2024, he had been in an out-of-home placement for 25 months. Therefore, we determine the State proved by clear and convincing evidence that A.Z.P. had been in an out-of-home placement for 15 or more months of the most recent 22 months when it filed the motion to terminate Amber's parental rights.

### 3. REASONABLE EFFORTS

Amber next assigns that the juvenile court erred in determining that DHHS made reasonable efforts to reunify her with A.Z.P.

Although the "reasonable efforts" standard applicable to all termination proceedings is a lower standard than the "active efforts" standard for ICWA cases that we have already determined was met in this matter, we determine this assignment fails for a different reason. This Court and the Supreme Court have consistently indicated that reasonable efforts to reunify a family are required under the juvenile code only when termination is sought under § 43-292(6). *In re Interest of Ky'Ari J.*, 29 Neb. App. 124, 952 N.W.2d 715 (2020); *In re Interest of Jade H. et al.*, 25 Neb. App. 678, 911 N.W.2d 276 (2018); *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002). Because we have determined that termination was proper pursuant to § 43-292(7), we need not determine whether the juvenile court erred in finding that reasonable efforts were made to reunify Amber with A.Z.P.

## 4. Best Interests

Amber's last assignment asserts the court erred in determining that it was in A.Z.P.'s best interests to terminate her parental rights.

A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id.*

In determining whether a parent is unfit, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id.* As children cannot and should not be suspended in foster care or be made to await uncertain parental maturity, when a parent is unable or unwilling to rehabilitate themselves within a reasonable period of time, the child's best interests require termination of parental rights. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016).

Given Amber's continued issues with her mental health, lack of stable housing, and apparent continued substance abuse, we determine the juvenile court did not err in deciding that terminating her parental rights was in A.Z.P.'s best interests. While we commend Amber for taking advantage of the many resources provided to her, we cannot ignore her inability to come to terms with her continued hallucinations. In the past, her hallucinations and delusions led to her threatening the lives of her children multiples times. During her psychological evaluation, she described how she dreamt about killing her children to protect them from being molested by spirits. She also discussed how she thought the children were sexually abusing each other and said she would kill one of them if they did anything to the others. These delusions then led to her attacking a neighbor with a knife because she believed the woman was not protecting her child from hostile spirits.

Although those incidents occurred several years ago and Amber has since been prescribed medication to alleviate her symptoms, her not understanding the severity of her hallucinations poses obvious risks. It is also concerning that Amber did not know she was diagnosed with schizophrenia and denied having hallucinations immediately after admitting to seeing a spiritual dragon in the courtroom. Even though Amber has taken some steps to treat her mental health problem, such as enrolling in therapy, it is clear that she has a long way to go before she can appropriately care for herself, let alone a young child.

Amber's housing situation is also not currently conducive to raising a small child. Since being paroled, Amber has lived in transitional housing that does not allow A.Z.P. to reside with her. She has since been put on a waitlist for housing, but it is not clear when that will become available.

Additionally, there are still ongoing concerns regarding Amber's history of substance abuse. Although she testified that she has been sober since April 2022, she tested presumptive positive for methamphetamine at the July 9, 2024, hearing. While we do not give much weight to the presumptive positive test alone, the record displays that Amber's behavior at the hearing was abnormal. Roberts explained that she was fidgeting and giggling at inappropriate times. Unfortunately, her urine sample was too small for more conclusive testing, but the presumptive positive test in conjunction with her odd behavior raises material concerns regarding her history of substance abuse.

Despite Amber's commendable efforts, she still suffers from a myriad of issues that prevent her from reunifying with A.Z.P. Given these ongoing problems, it does not appear that she will become a fit and capable parent any time soon. Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024). A.Z.P. deserves stability and security in his life. At the time of the hearing, he had been in foster care for 28 months. Due to his time away from Amber, he does not recognize her to be his mother. Instead, he views his foster mother as his mother. A.Z.P. should not be suspended in foster care to wait for Amber to come to terms with her mental health problems. Accordingly, based on our review of the evidence, we agree with the juvenile court that Amber was unfit and that terminating her parental rights was in A.Z.P.'s best interests.

## VI. CONCLUSION

We conclude the State proved by clear and convincing evidence that active efforts had been made to prevent the breakup of the Indian family and that these efforts had been proven to be unsuccessful. We also determine the State proved beyond a reasonable doubt, supported by qualified expert testimony, that Amber's continued custody of A.Z.P. was likely to result in his serious emotional or physical damage. Lastly, we conclude that the State proved by clear and convincing evidence that grounds to terminate Amber's parental rights to A.Z.P. existed under § 43-292(7) and that terminating her parental rights was in his best interests.

AFFIRMED.