IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF MIA C.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF MIA C., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ALICIA C., APPELLANT.

Filed December 30, 2025.    No. A-25-203.

Appeal from the Separate Juvenile Court of Sarpy County: SARAH M. MOORE, Judge. Affirmed.

Lisa M. Gonzalez, of Johnson & Pekny, L.L.C., for appellant.

Brianna L. McLarty, Deputy Sarpy County Attorney, for appellee.

RIEDMANN, Chief Judge, and MOORE and BISHOP, Judges.

BISHOP, Judge.

## INTRODUCTION

Alicia C. appeals from the decision of the separate juvenile court of Sarpy County, terminating her parental rights to her daughter, Mia C. We affirm.

## BACKGROUND

### PROCEDURAL BACKGROUND

Alicia is the mother of Mia, born in 2019. Mia's biological father was identified after a paternity test, but he was incarcerated and had never met her. Our record does not reveal any information as to the current status of his parental rights. He is not part of this appeal and will not be discussed further.

- 1 -

On May 10, 2023, the State filed a petition alleging that Mia was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because she lacked proper parental care by reason of the fault or habits of Alicia in that:

> A. Alicia['s] . . . use of alcohol and/or controlled substances places said child at risk for harm.
>
> B. Alicia . . . has failed to provide said child with proper care, supervision, support and/or safety.
>
> C. Alicia . . . has failed to provide said child with safe, stable and/or appropriate housing.
>
> D. Due to the above, the minor child is at risk for harm.

The State also filed an ex parte motion for immediate temporary custody of Mia to be placed with the Nebraska Department of Health and Human Services (DHHS), and the juvenile court entered an ex parte custody order that same day. Mia has since remained in the custody of DHHS and in foster care.

An adjudication hearing was held on October 11, 2023; Alicia failed to appear, but her counsel was present. In its order entered that same day, the juvenile court found, by a preponderance of the evidence, that the allegations in the petition were true. Accordingly, Mia was adjudicated to be a child within the meaning of § 43-247(3)(a).

A disposition hearing was held on November 27, 2023, and the juvenile court entered its order the following day. The court ordered Alicia to successfully complete a parenting program; actively participate in agency supervised parenting time; maintain legal employment and safe and stable housing; comply with the recommendations of the co-occurring evaluation; work with family support services until successfully discharged; and submit to random and frequent drug and alcohol testing (UA's). Following subsequent review and permanency planning hearings, Alicia was also ordered to provide DHHS with employment verification, provide DHHS with contact information for her mental health provider, work with DHHS on making applications for housing, and complete an updated substance abuse evaluation if necessary for housing.

On August 22, 2024, the State filed a motion to terminate Alicia's parental rights to Mia pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). The State alleged that: Alicia substantially and continuously or repeatedly neglected and refused to give Mia necessary parental care and protection; reasonable efforts to preserve and reunify the family, if required, failed to correct the conditions leading to the adjudication of the child under § 43-247(3)(a); the child had been in an out-of-home placement for 15 or more months of the most recent 22 months; and termination of Alicia's parental rights was in the child's best interests.

Pursuant to an order entered on November 14, 2024, Alicia's visits were reduced from three times per week to two times per week due to her inconsistency with visitations.

TERMINATION HEARING

The parental rights termination hearing was held on January 24 and 27, 2025. The State called several witnesses to testify, and numerous exhibits were received into evidence. Alicia did not testify, and she did not call witnesses to testify on her behalf.

Tamara Chiburis, a child and family services specialist, was assigned to this case on July 5, 2023, and was the ongoing caseworker at the time of the termination hearing. Chiburis testified that when she was first assigned to this case, she reviewed the case file. According to Chiburis, Mia was removed from Alicia's care because there were concerns about Alicia's substance and alcohol use, and her failure to provide Mia with proper supervision and safe and stable housing. After her removal, Mia had been in multiple placements before her current foster home.

Alicia had been court ordered to complete a co-occurring evaluation and follow all recommendations. Chiburis testified that Alicia completed a co-occurring evaluation in October 2023, and Level 2.1 intensive outpatient treatment was recommended.

Caitlin Stephen Schult, a licensed mental health practitioner and professional counselor, conducted the evaluation of Alicia on October 30, 2023. Schult testified that Alicia reported a history of cannabis, methamphetamine, Xanax, and alcohol use. Alicia also reported her alcohol use had increased since April, and she had driven under the influence of alcohol in the previous year. Schult diagnosed Alicia with "alcohol use disorder severe"; "sedative, hypnotic or anxiolytic disorder severe in early remission"; "tobacco use disorder moderate"; and a "depressive disorder." Schult recommended "Level 2.1. intensive outpatient treatment" for Alicia; "2.1 is a step up from outpatient and it is a step . . . down from an inpatient setting." Schult does not provide that level of treatment but said that Level 2.1 treatment is available at UNMC, Lutheran Family Services, and "various other providers" in the area.

Chiburis testified that she provided Alicia information on "various agencies, local agencies" for Level 2.1 treatment, but she never received confirmation that Alicia successfully completed that treatment. In January or February 2024, Alicia reported that she was seeing a therapist at UNMC, but Chiburis was not able to locate that therapist, and Alicia was not able to provide documentation about her treatment with that therapist. An updated co-occurring evaluation was ordered in the spring of 2024.

Anita Akers is a licensed independent mental health practitioner and a licensed alcohol and drug counselor. Akers testified that she was scheduled to conduct a co-occurring evaluation of Alicia on June 13, 2024. Although Alicia came to the office that day, she left before meeting with Akers. Alicia did not reschedule, and Akers never completed the co-occurring evaluation.

Chiburis testified that Alicia reported completing an updated co-occurring evaluation in June 2024, but then Alicia said she lied and had not done the evaluation. According to Chiburis, Alicia never completed the updated co-occurring evaluation, and she (Chiburis) had not been able to confirm any substance use treatment.

Alicia had also been ordered to complete random UA's. Chiburis testified that from May 2023 to the end of October 2024, eight agencies had been assigned to do Alicia's UA testing, and all of them discharged her for lack of participation or engagement. Genese Hodges, a drug testing specialist at one of the agencies, testified that she was assigned to Alicia beginning in March 2024. Alicia was supposed to drug test twice each week, but Hodges was only able to contact Alicia one time, March 13, and she tested positive for amphetamines and methamphetamines that day. Hodges' subsequent efforts to contact Alicia via text messages and email were unsuccessful. Based on her personal observations, Chiburis believed that Alicia may be still using alcohol or drugs. Chiburis observed "[e]rratic behavior, yelling, screaming, verbally aggressive, she'll be happy one minute, and then screaming."

Alicia was court ordered to successfully complete a parenting program; she completed her parenting class in May 2024. She was also ordered to work with family support services until successfully discharged, maintain legal employment and safe and stable housing.

Shawn Franklin, a family support worker and in-home specialist, testified that in late April 2024, she received a referral to provide family support services to Alicia. "[M]ost times," Alicia would not attend scheduled meetings; they only met in person "maybe three times." The case plan goals they were supposed to work on were the parenting class, completing evaluations, addressing substance abuse, employment, and housing. Franklin stated that Alicia was given resources for a parenting class. Franklin spoke to Alicia about "going into detox," but Alicia was worried about her dog and "also wanted to get other things situated before going"; Franklin was never able to get her into treatment. Alicia reported working for a friend, cleaning their house, but Franklin encouraged her to obtain more stable employment. Alicia had been staying with her mother, but said it "wasn't a good situation," so Franklin gave her resources for housing links, including the Omaha Housing Authority and Douglas County Housing Authority. Franklin stated that Alicia "talked about the love she has for her daughter and how she wanted to get herself together for her daughter." When asked what she observed Alicia do to put those words into action, Franklin responded, "Not too much." Alicia was discharged in July for "[l]ack of engagement" after she missed too many meetings.

Chiburis testified that from May 2023 through October 2024, five agencies accepted referrals to provide family support services to Alicia, and all five discharged her for lack of engagement. Chiburis had no confirmation of employment for Alicia. Chiburis stated that "[Alicia] has housing[,] I don't know if it's safe and stable based on my beliefs of a toxic relationship between her and her mother"; Alicia's communication with her mother "is not appropriate, very assaultive verbal." Additionally, Alicia has moved back and forth between her boyfriend's house and her mother's house.

Chiburis testified that from May 2023 through December 2024, Alicia attended 62 percent of her scheduled visits with Mia. Gregory Gruss, a visitation specialist, testified that he supervised four of Alicia's visits with Mia, starting in October 2024. According to Gruss, Alicia tried to be "present" during visits and emotionally supportive of Mia, and Alicia and Mia engaged with one another during visits and appeared to have a bond. Visitation records received into evidence reveal that, for the most part, Alicia's visits with Mia have gone well. However, the visitation records also reveal that law enforcement was called to two visits in 2024, and Mia was present on both occasions. Law enforcement was called in February when Alicia got into an argument with a restaurant worker, and then in November when she was not cooperative with the visitation worker and refused to allow the worker to end the visit early and leave with Mia.

According to Chiburis, Mia has been diagnosed with "an adjustment disorder with a mixed emotion and conduct disorder." She "has a history of pinching, hitting, spitting, slapping, and tripping," "a wide variety of behaviors" that need to be addressed. She is "very energetic and definitely needed some extra guidance and support and structure." An evaluation in January 2024 recommended family therapy with Alicia, but Chiburis "kind of held off on that" because Alicia was doing a parenting class and Chiburis wanted Alicia to work on her own goals and orders first. Chiburis was concerned about Alicia's ability to meet Mia's behavioral and emotional needs because "[Alicia] hasn't made any progress to address her own mental health needs" and "I think

- 4 -

she needs to do that before she can safely meet her daughter's emotional and behavioral needs." Chiburis said she talked to Alicia about Mia's behaviors and behavioral therapy, but "most of our in person visits don't go well," and "we never really often times get to Mia."

Haley B. had been Mia's foster mother since June 2024. Haley testified that Mia initially had "major" behavior issues "almost every day," but implementing structure and consequences "helped." Mia had a behavior management chart in school and Haley also utilized behavior charts at home. Mia "thrives" on a schedule and "wants to know what happens next." She "does not react well to unexpected unforeseen changes," and her behaviors (e.g., yelling and hitting) increase. Haley observed that Mia's behaviors "often coincided with visitation." If a visit was canceled, Mia would be "sad and despondent on the couch." When coming back from a visit, Mia would "often be very over the top energetic and running around and almost a destructive manner" and "would also say no to everything." Pursuant to an order entered on November 14, 2024, Alicia's visits were reduced from three times per week to two times per week due to her inconsistency with visitations. According to Haley, the frequency of Mia's behaviors has decreased since her visits have been reduced. Mia refers to Alicia as "Alicia," and calls Haley "mom."

Julie Ricceri testified that she had been Mia's court-appointed special advocate (CASA) since October 2023. According to Ricceri, Mia has higher behavioral needs than an average child her age and she needs structure to be able to behave in an appropriate way.

Ricceri testified that Alicia was "always interested" in how Mia was doing and she "always asks what do I need to do to get my daughter back." When asked about her interactions with Alicia, Ricceri responded, "They kind of go in a pattern," "they start out very nicely and then typically Alicia will get upset about something and she'll start being verbally abusive," and then "we'll kind of back off, not say anything," and "she calms back down and she's fine again"; but "if you try and talk her through that she gets more upset." Alicia can get upset during discussions about what she needs to do to get her daughter back or when she cancels a visit and it cannot be rescheduled, "it can be anything." Ricceri recalled incidents (but no specific dates) when Alicia was "abusive" or "threatening" in text messages. One time, Alicia said that Ricceri's "[expletive] will burn in hell . . . for taking her daughter." Another time Alicia said that she "may not get the opportunity to pay [Ricceri] back for taking her daughter but God will." According to Ricceri, Alicia made similar statements to Chiburis. (Chiburis testified that she "will not have contact or a visit with [Alicia] alone," and the CASA is "at every single contact and visit.")

Ricceri opined that Mia did not have a beneficial relationship with Alicia. She said, "I really fear for Mia if she goes back to her mom for her safety, emotional safety and possible physical safety." Alicia can get "volatile" with providers and "frequently cancelled visits." She had also been verbally aggressive towards her mother, with whom she currently lived. Nothing in the visitation notes reviewed by Ricceri indicated that Alicia had lost her temper with Mia.

Ricceri believed that terminating Alicia's parental rights was in Mia's best interests because Alicia "has not followed any court orders except for the parenting class," she is "volatile, verbally abusive," and she does not have employment or stable housing. Ricceri stated that Alicia "loves Mia," but "everything else is getting in the way and she hasn't done what she needs to do to get Mia back to make sure that Mia is going to have a safe, healthy, steady life in general."

Chiburis testified that "[A]licia's been given 21 months to work on the Court orders of the case plan" and "she's accomplished maybe one." Chiburis opined that it would be in Mia's best interests to terminate Alicia's parental rights.

In an order filed on February 19, 2025, the juvenile court terminated Alicia's parental rights to Mia after finding by clear and convincing evidence that statutory grounds for termination existed pursuant to § 43-292(2), (6), and (7), and that Alicia was unfit and termination of her parental rights was in the child's best interests.

Alicia appeals.

## ASSIGNMENTS OF ERROR

Alicia assigns that the juvenile court erred in finding there was clear and convincing evidence that (1) statutory grounds exist to terminate her parental rights under § 43-292(2), (6), and (7), and (2) termination of her parental rights was in the child's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## ANALYSIS

### STATUTORY GROUNDS FOR TERMINATION

The State sought to terminate Alicia's parental rights to Mia under § 43-292(2), (6), and (7). The juvenile court found all three grounds existed by clear and convincing evidence.

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." The existence of the statutory basis alleged under § 43-292(7) should be determined as of the date the petition or motion to terminate is filed. *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). By the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. *In re Interest of Mateo L. et al., supra*. Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra*. In other words, if the 15-out-of-22 months' period is met, § 43-292(7) is met. See *In re Interest of Mateo L. et al., supra.*

Mia was removed from Alicia's custody on May 10, 2023, and she remained in foster care thereafter. By the time the motion to terminate Alicia's parental rights was filed on August 22, 2024, Mia had been in an out-of-home placement for 15 months, thus the 15-out-of-22 months' period was satisfied.

The State has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for terminating Alicia's parental rights to Mia. And since any one of the bases for termination

codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning any other statutory basis for termination. *In re Interest of Mateo L. et al., supra*. We next consider whether termination is in Mia's best interests.

BEST INTERESTS AND UNFITNESS

Under § 43-292, in addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

Notably, Alicia has failed to make meaningful progress in this case. Alicia completed a co-occurring evaluation in October 2023, but there is no evidence that she completed the recommended Level 2.1 intensive outpatient treatment. She did not complete an updated co-occurring evaluation in 2024, and Chiburis was not able to confirm any substance use treatment. Alicia was discharged from eight alcohol and drug testing agencies for lack of participation or compliance; the one test the record shows she completed was in March 2024, and she tested positive for amphetamines and methamphetamines at that time. Alicia was also discharged from five family support agencies due to her lack of engagement. Alicia participated in only 62 percent of scheduled visitations, which remained fully supervised; and in November 2024 her visits were reduced from three times per week to two times per week due to her inconsistency in attendance. Alicia's employment could not be verified, and the safety and stability of her housing was questionable. The only court-ordered requirement that Alicia fully completed was the parenting class.

By the time of the termination hearing, Mia had been in an out-of-home-placement for 20 months. Both the ongoing caseworker and Mia's CASA opined that the termination of Alicia's parental rights was in the child's best interests. We agree. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). And when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Leyton C. & Landyn C., supra*. The State proved that Alicia was unfit, meaning that she has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the child's well-being. See *id.* We further find that

there is clear and convincing evidence that it is in Mia's best interests to terminate Alicia's parental rights.

## CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Alicia's parental rights to Mia.

AFFIRMED.